Breitel,, J.
Plaintiffs, infant passenger and her father, appeal in an action to set aside a general release and to recover damages for the infant’s personal injuries arising out of a collision of automobiles owned and driven by the defendants. Special Term denied defendants’ motion for summary judgment. The Appellate Division in an opinion unanimously reversed ‘1 on the law and the facts ’ ’, granted defendants summary judgment and dismissed the complaint (27 AD 2d 194).
Plaintiffs, Anthony Mangini, father of the injured infant, in his own right, and Deborah Mangini, through her father as guardian ad litem, seek to set aside general releases given to the Perohas, owner and driver of the car in which Deborah was a passenger, and the McClurgs, owner and driver of the other car. The Manginis alleged that the releases were entered into *560 under a mutual mistake of fact as to the extent of her injuries, and that the parties did not intend to discharge liability for unknown injuries. Plaintiffs also allege that, if the defendants knew of the injuries, then the releases were procured through fraud -and misrepresentation.
The existence of a disputed issue of fact depends upon what, as a matter of law, constitutes a mistake of fact as to an unknown injury and when, also as a matter of law, subsequent discovery of unknown injuries justifies the setting aside of a general (~ release. It is concluded that there are issues of fact both as to : the parties’ knowledge of the injuries suffered, and their inteni tion to release liability for unknown injuries, and that summary I judgment should have been denied.
The affidavits disclose the following facts. On February 26, 1963 Deborah Mangini, approximately 18 years of age, was a passenger in the Peroha automobile when it collided with the McClurg automobile.
Deborah was examined the day of the accident by Dr. Harrington, at which time she said she had been riding in the front seat of the Peroha car, and that upon the collision ‘1 she was thrown to the floor of the car striking her face on the dashboard and injuring her knees and her lower back.” In addition to head and knee injuries, Deborah complained of ‘‘ pain and tenderness of the lumbar spine with pain radiating down the posterior left thigh. ’ ’ In April, 1963 she was again examined by Dr. Harrington, and again complained of the pain in the lower back and left posterior thigh. These symptoms Dr. Harrington attributed to ‘ ‘ lumbo-sacral strain based upon nerve-root irritation. ’ ’
On May 9, 1963 Deborah was examined by Dr. Schlesinger. She told him that the lower back pain had become more severe. He diagnosed her condition as a “ chronic derangement of the low lumbar spine, most likely discogenic in origin at the L5-S1 disc. ’ ’ He noted that he would like to check her again in a month, but no additional examination was made.
Deborah testified in pretrial examination (of which only incomplete excerpts are supplied) that she had experienced pain, 11 on and off ’ ’, in the area of her left hip since the day after the accident, as well as a swelling in the upper part of her left thigh. She also heard a ‘ ‘ hitch ” or a “ catch ” or a “ click ’ ’ in the region of her left hip and commented to her father about it.
*561 A lawyer, Mr. Eossi, had been retained shortly after the accident to represent Deborah and her father. Eventually it was decided to settle the claims. On May 20,1963 Deborah was examined by a physician for the insurer of the Peroha vehicle, Dr. Magovern. He recorded that Deborah stated that as a result of the accident her lower back and left hip became stiff, and that she complained that 1 ‘ the left hip seems to catch, or click, frequently, and the lower back bothers on getting out of a chair. ’ ’ He diagnosed a swelling on the outer side of the center of the left thigh as a “ resolving, or absorbing, hematoma. ’ ’ He concluded that there was “ [m] oderate strain of the superficial muscles of the lumbar area ” and that “ [t]here will be no permanency. A period of one week total disability with an additional two weeks partial disability could be expected.”
Plaintiffs ’ lawyer, Mr. Eossi, made contact with a claims agent of one of the insurers in June, 1963. The agent was given the reports of Drs. Harrington, Schlesinger, and Magovern and negotiated a settlement with Mr. Eossi for all defendants. The Manginis were to receive a total of $1,250 plus medical expenses of $198.28. Mr.. Eossi obtained the necessary court order of approval for the infant Mangini, and prepared the releases.
On June 29, 1963 the Supreme Court, Saratoga County, authorized a compromise of Deborah Mangini’s claim for $1,000. On July 1, 1963 general releases were executed, releasing the defendants “ of and from all, and all manner of action and actions * * * damages * * * and demands whatsoever, in law and equity * * # ever had, now have * * * or * * * shall or may have * * * by reason of any matter * * * from the beginning of the world to the day of the date of these presents. And more particularly for any and all claims for personal injuries, medical expenses, loss of wages [claims for expenses and loss of services] as a result of an automobile accident on February 26, 1963 ”,
Just about a half-year later, in December, 1963, Deborah was examined by Dr. Gazeley. She complained, as she had before the settlement, of the clicking and “ a hitching sensation ” in the area of the left hip. Upon X-ray examination, Dr. Gazeley determined that Deborah “ had suffered a condition known as osteochondritis dissecans of the left hip. There was an avascular necrosis of the femoral head of the left hip * * * The *562 condition * * * was brought about presumably by a blow to the knee area which stressfully forced the femoral head into the socket damaging the blood supply to the femoral head.” ‘ ‘ The ‘ hitch ’ would come from a gradual flattening of the femo”ral head and would develop only after at least six months from the time of injury. The infant plaintiff must have been mistaken when she said she noticed the 1 hitch ’ so soon after the injury.”
Drs. Gazeley, Schlesinger, and Harrington all agreed that examinations before the settlement could not have revealed this later diagnosed condition, although the causative injury was sustained at the time of the accident.
The hip condition is alleged to have been extremely painful, to have required extensive surgery, and to have resulted in permanent injury. The complaint seeks a total of $110,000, and covers both the “ unknown ” injuries and injuries that were apparently considered at the time of the release.
It is true that a general release is governed by principles of contract law. There is little doubt, however, that its interpretation and limitation by the parol evidence rule are subject to special rules. These rules are based on a realistic recognition that releases contain standardized, even ritualistic, language and are given in circumstances where the parties are sometimes looking no further than the precise matter in dispute that is being settled. Thus, while it has been held that an unreformed general release will be given its full literal effect where it is directly or circumstantially evident that the purpose is to achieve a truly general settlement (Lucio v. Curran, 2N Y 2d 157), the cases are many in which the release has been avoided with respect to uncontemplated transactions despite the generality of the language in the release form (e.g., Cahill v. Regan, 5 N Y 2d 292; Mitchell v. Mitchell, 170 App. Div. 452, 456; see, also, Simon v. Simon, 274 App. Div. 447, 449; Haskell v. Miller. 221 App. Div. 48, affd. 246 N. Y. 618; Rubinstein v. Rubinstein, 109 N. Y. S. 2d 725, 732, affd. 279 App. Div. 1073, affd. 305 N. Y. 746; 49 N. Y. Jur., Release and Discharge, §§ 19, 31, 34, 35, 46).
The cases go in diverse directions or are completely uninformative on whether a specific recital in the release of the dispute settled creates a presumption that the general language is restricted or whether the absence of a specific recital creates *563 a presumption that the general language controls (see 49 N. Y. Jur., loe. cit.). Realistically, it would seem the better view not to rest any distinction upon what may be no more than the scrivener’s strategic device or an inadvertence, especially since, if the issue rises in reformation, the use of parol evidence is not barred. Since the issue turns on a matter of intention developable, dehors the instrument, in reformation (and, occasionally,' ] as a matter of construction without reformation), the literal lan- ! guage should not be determinative of the ultimate result or be j applied mechanically. The language used, of course, remains a J significant circumstance in determining the intention, just the - same as who was the draftsman of the document.
This is not to say that a release may be treated lightly. It is a jural act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice. It is for this reason that the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be established or else the release stands. In the instance of mutual j mistake, the burden of persuasion is on the one who would set I the release aside.
Hence, the releasor, whether the issue arise in reformation ^ or on construction of the instrument, must sustain the burden of persuasion if he is to establish that the general language of the release, valid on its face and properly executed, is to be limited because of a mutual mistake, or otherwise does not rep- ■ resent the intent of the parties. (See Ann. Personal Injury Release-Avoidance, 71 ALR 2d 82, 170-171. But see Moses v. Carver, 164 Misc. 204, 210, affd. 254 App. Div. 402; Thorne v. Columbia Cab Corp., 167 Misc. 72, 76-77, revd. on other grounds 168 Misc. 255, affd. 256 App. Div. 906.) Where, however, the release is challenged on grounds of duress, illegality, or fraud, 1 the burden of persuasion remains with the releasee (see Fleming v. Ponziani, 24 N Y 2d 105; Boxberger v. New York, N. H. & H. R. R. Co., 237 N. Y. 75.)
The principle has spilled over into the personal injury field. Here, however, the problem is beset with a special difficulty because the accident and initial trauma are obviously one trans *564 action. Nevertheless, the courts have applied the special rules, by way of analogy, to unknown injuries, treating them as matters not in contemplation at the time of settlement, despite the generality of standardized language in releases (see 6 Corbin, Contracts [1962], pp. 181-182; Keefe, Validity of Releases Executed Under Mistake of Fact, 14 Fordham L. Rev. 135, 146-148; Ann. Personal Injury Release-Avoidance, 71 ALR 2d 82, supra; Ann. Release-Personal Injuries-Avoidance, 48 A. L. R. 1462). But, if from the particular language of the release or from the circumstances of the negotiated settlement, there was a conscious and deliberate intention to discharge liability from all consequences of an accident, the release will be | sustained and bar any future claims of previously unknown injuries (Viskovich v. Walsh-Fuller-Slattery, 16 A D 2d 67, affd. 13 N Y 2d 1100; Potter v. Guertse, 5 A D 2d 924; Yehle v. New York Cent. R. R. Co., 267 App. Div. 301, affd. 295 N. Y. 874).
It requires particular emphasis that, more often than not, the releasors in personal injury cases are willing to settle for relatively small sums, or sums that do not discount injuries unknown at the time because of the doubtful liability of the releasee, even when ordinary caution would suggest awaiting the development of unknown injuries or consequences. When that is the inducement it would be false reasoning to assume that the amount of the settlement or the precipitousness of effecting the settlement is corroborative of a mutual mistake. r Moreover, in this development in the law in resolving claims i of mutual mistake as to injury at the time of release, there has \ been delineated a sharp distinction between injuries unknown i to the parties and mistake as to the consequence of a known ^injury. A mistaken belief as to the nonexistence of presently [existing injury is a prerequisite to avoidance of a release (Brown v. Manshul Realty Corp., 271 App. Div. 222, affd. 299 N. Y. 618). r If the injury is known, and the mistake, it has been said, is / merely as to the consequence, future course, or sequelae of a Í known injury, then the release will stand (Flandorfer v. Wilford, 25 A D 2d 751; Perry v. Kingston City Transp. Corp., 19 A D 2d 202; Acevedo v. City of New York, 15 A D 2d 899, affd. 17 N Y 2d 843; Mack v. Albee Press, 263 App. Div. 275, affd. 288 N. Y. 623 ; 49 N. Y. Jur., Release and Discharge, § 19, pp. 358-359). The distinction, a well-established one, is more easily *565 expressed than applied in practice, and as a result the cases, it will be seen, do not classify perfectly.
The Appellate Division reversed and granted summary judgment in this case, reasoning that an examination of the affidavits and pretrial examinations “ discloses that whether the condition was due to some lumbar back injury or to the subsequent hip injury, there existed at that time [of settlement] known symptoms of continuing discomfort” (27 A D 2d, at p. 198). The issue posed, then, is whether the knowledge of symptoms, erroneously attributed to known injury to another part of the body, constitutes knowledge of the injuries so as to preclude the claim of mutual mistake of fact.
The affidavits permit the factual conclusion that despite the sensation of pain in the (i hip area ” it was believed by all the physicians who examined Deborah prior to the settlement that there had been no injury to the hip or femur, and that the pain was a symptom of lower back injury and nerve root irritation. The favorable prognosis of recovery was apparently made on this erroneous assumption of facts. This would not be surprising, since there was no report of any external injury to the hip. Indeed, the condition eventually discovered had been sustained as a result of the impact of the knee against the floor of the car, and did not involve direct contact with the hip at all. A jury could find that at the time of settlement it was believed that the hip or femur was uninjured and that the release was based on a favorable prognosis given for the lower back injury.
Certainly the sensation of pain in the hip area cannot be considered constructive notice of the injury to the femur. Even where a releasor has knowledge of the causative trauma, it has been held that there must be actual knowledge of the injury. Knowledge of injury to an area of the body cannot cover injury of a different type and gravity. Thus knowledge of superficial injury to the knee area was held not knowledge of serious bone injury (Lockrow v. Church of Holy Family, 5 A D 2d 959, affd. 5 N Y 2d 1024). Nor did knowledge of a concussion or of a laceration of the exterior of the skull constitute knowledge of brain injury (Le Francois v. Hobart Coll., 31 N. Y. S. 2d 200, affd. 262 App. Div. 802, affd. 287 N. Y. 638; Harvey v. Georgia, 148 Misc. 633; see, also, Evans v. Groves Sons Co., 315 F. 2d 335, 338-341, in which Friendly, J., in a diversity case, after a *566 review of the New York decisions, held that, where a blow on the head caused known external injury, a general release, with language discharging liability for “ known and unknown injuries ”, would not cover a thrombosis of the left lateral sinus, and that such internal injury constitutes an unknown injury).
An additional problem is created by the proof of a clicking sound, contemporaneous with the settlement, and emanating from the region of the left hip. It raises the question whether the parties ’ physicians should have known of the femoral injury and have changed their mistaken diagnosis. Although Dr. Magovern’s report notes that Deborah complained of the sound, there is no reference to possible hip injuries. Also relevant is Dr. Gazeley’s affidavit that the hitch would not have developed so early as Deborah noted. It is possible that the hitch, if noted four, rather than six, months after the accident, would not serve as adequate warning of a serious and different injury to the hip, as distinguished from the lower back sprain. In any event, this poses a question of fact.
If one assumes that a mutual mistake as to an unknown injury to the hip or femur may have occurred, there still remains the question under what circumstances the mistake will serve to set aside a release. As already observed, there are many reasons, including doubtful liability, the willingness to take a calculated risk, the desire to obtain an earlier rather than a later settlement, and perhaps others, why releasors may wish to effect a settlement and intend to give the releasee a discharge of liability for any unknown injuries — in short to bargain for general peace. When general peace is the consideration.there can be no mutual mistake as to the extent of the injuries, known or unknown.
In Farrington v. Harlem Sav. Bank (280 N. Y. 1), it was established that a release could be made covering both known and unknown injuries, “ provided the agreement was fairly and knowingly made ” (id., at p. 4). This limitation on releases for unknown injuries, first applied to a claim that the plaintiff thought he was signing a mere receipt for money to pay a doctor’s bill, was applied in other cases of fraud (Wheeler v. State of New York, 286 App. Div. 310 ; Scheer v. Long Is. R. R. Co., 282 App. Div. 724). Fraud, however, had long been a ground for setting aside a release (see Fleming v. Brooklyn Hgts. R. R. *567 Co., 95 App. Div. 110). The requirement of an “ agreement fairly and knowingly made ” has been extended, however, to cover other situations where because the releasor has had little time for investigation or deliberation, or because of the existence of overreaching or unfair circumstances, it was deemed inequitable to allow the release to serve as a bar to the claim of the injured party (see, e.g., Duch v. Giaquinto, 15 A D 2d 20 ; Landau v. Hertz Drivurself Stas., 237 App. Div. 141; Castenada v. Ruderman, 48 Misc 2d 321).
Other cases, often discussing fairness, have turned on a finding that, despite express language covering unknown injuries, the parties contemplated a release only as to known injuries (Rill v. Darling, 21 A D 2d 955; Scheer v. Long Is. R. R. Co., supra; Brown v. Manshul Realty Corp., 271 App. Div. 222, affd. 299 N. Y. 618, supra; Barry v. Lewis, 259 App. Div. 496, mot. for lv. to app. den. 259 App. Div. 1072; Parker v. United Tank Truck Rental, 21 Misc 2d 246; Kropp v. Diamond K Markets, 207 Misc. 1030).
There are cases, however, where there was no fraud, no claim of overreaching, no haste, adequate representation of the releasor, and no claim that despite the language of the release, covering unknown injuries, a limited release was found to have been intended, and the release was not avoided merely because the parties were mistaken as to present injuries (e.g., Viskovich v. Walsh-Fuller-Slattery, supra; Potter v. Guertze, supra; Yehle v. New York Cent. R. R. Co., supra). In each of these cases, and others, the nature of the subsequently discovered injuries were not, as a practical or medical matter, so distinguishable from unanticipated consequences of a known injury. In the first two cases mentioned the same site of injury was involved and ordinary medical caution would have suggested the possibility of the associated injury at the site. In the Yehle case, the original known injuries were so widespread and extensive that there was little or no significance to possible undiagnosed injuries, and had they been contemplated the settlement might have gone forward nevertheless. Indeed, the known injuries were so great that even the actual future incapacity of the victim was discussed, and the victim’s husband warned her that a general release would be a gamble.
*568 The cases, in applying the requirement that the release be “ fairly and knowingly made ” to situations falling far short of actual fraud, have recognized that in the sensitive area of release of liability for physical injuries, experience, and sophisticated awareness are almost always with the releasee, even when the releasor is represented by counsel. The burden of persuasion on the whole issue, as noted earlier, remains with the one seeking to overturn the generality of the release, to establish that he did not intend more than a limited release; that he did not know and could not know of the later revealed injuries, and that different injuries are involved rather than unanticipated consequences of known injuries.
~ It would appear then that the affidavits and pretrial testimony presented on this motion for summary judgment fail to demonstrate conclusively that no issue of fact remains as to the intent of the parties.
The instant complaint alleges that the parties did not intend to release unknown injuries, and, therefore, the femoral injury. Although an affidavit of Raymond Myers, the claims representative who negotiated the release on behalf of the defendants, states that the “ settlements were made in good faith in behalf of all defendants * * * as full and final settlements of said claims ”, there is no averment of the discussions between the agent and the Manginis ’ former lawyer, nor any indication that the parties discussed the consequences of later discovery of an injury more severe than medical examination had theretofore suggested. Myers states that ‘ ‘ In making said settlements, I considered, among other injuries, the claimed injuries to Deborah Mangini’s left thigh and left hip. If there were any mistake about such injuries, it was not my mistake nor that of defendants.” Myer’s reference to “injury to Deborah Mangini’s left * * * hip ”, apparently based on Dr. Magovern’s report, does not indicate whether the possibility of actual but unknown injury to the hip or femur was contemplated or, as believed by the attending physicians, the hip symptoms were considered, at the time, a consequence of the lower back injury. Thus, this case involves two distinct injuries flowing from the same accident, one known and one unknown.
The fact that plaintiffs ’ former lawyer prepared the releases, while a highly significant circumstance, is not controlling. *569 Despite the standardized language of the releases, the releasors are entitled to prove, directly or circumstantially, that there was no intention to release a claim for unknown injuries.
Since it is concluded that the motion for summary judgment should not have been granted, and that a trial is necessary, it is unnecessary to consider the Manginis’ second argument that summary judgment should be denied because the Manginis intend to prove fraud at the trial. In any event, there is no evidentiary submission suggestive of fraud or overreaching.
Accordingly, the order of the Appellate Division should be reversed, without costs, and the action remanded for trial.