16 F.3d 414
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES OPTICAL, INCORPORATED, Plaintiff-Appellant,
and
Ronald S. Ace, Plaintiff,
v.
CORNING INCORPORATED, Defendant-Appellee.
Ronald S. ACE, Plaintiff-Appellant,
and
United States Optical, Incorporated, Plaintiff,
v.
CORNING INCORPORATED, Defendant-Appellee.
 Nos. 93-1284, 93-1466.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 27, 1993.
Decided: January 6, 1994.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. M.J. Garbis, District Judge.
 Paula Fitzgerald Wolff, Potomac, Maryland, for Appellants.
 Gordon Laurence Lang, Nixon, Hargrave, Devans & Doyle, Washington, D.C., for Appellee.
 D.Md.
 AFFIRMED.
 Before RUSSELL and WILLIAMS, Circuit Judges, and SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Appellants United States Optical, Inc. ("USO") and Ronald S. Ace ("Ace"), president and principal shareholder of USO, brought suit against appellee Corning, Inc. ("Corning"). Appellants' numerous claims for relief arise out of a long-term business relationship between USO and Corning and several agreements between USO and Corning and between Ace and Corning. Appellants appeal the district court's grants of summary judgment in favor of Corning. We affirm.
 
 I.
 
 2
 Ace owns the patent for the production of a laminated glass/plastic eyeglass lens product, "Photo-glastic." In 1984, Ace informally licensed the Photo-glastic patent to USO, a closely held Maryland corporation. Subsequently, on April 8, 1986, he signed an exclusive agreement licensing the patent to USO.
 
 
 3
 On July 10, 1986, USO and Corning, a large New York corporation that makes glass and optical products, entered into two agreements--a "Security Agreement" and a "Supply Agreement"--designed to facilitate the development of USO's product. Under the Security Agreement, Corning agreed to guarantee USO's payment of a $ 1 million note--later increased to $ 1.3 million--to Citibank in exchange for a security interest in USO's physical assets. Under the Supply Agreement, Corning agreed to supply USO with photochromic lens pressings, and received a right of first refusal on the licensing of Photo-glastic. Also on July 10, 1986, Corning entered into separate agreements with Ace, in his personal capacity, whereunder Ace agreed to take steps necessary for USO to meet its various obligations under the supply and security agreements.
 
 
 4
 Appellants contend that, for several years prior to the execution of these agreements, Corning had endeavored to obtain USO's patent licensing rights for Photo-glastic, and that these efforts continued after the Security and Supply Agreements were signed. USO claims to have rejected as insufficient all offers of Corning to buy the patent rights.
 
 
 5
 Appellants also contend that the parties also entered into several oral agreements, both before and after the execution of the Supply and Security Agreements. Appellants claim that, pursuant to these agreements, Corning agreed, among other things, to exchange technical assistance and information as it was needed, and to deal in good faith with appellants. Appellants claim that Corning breached its agreement by refusing to disclose certain information about the glass it was supplying to USO. This refusal, it is alleged, led to the company's inability to perfect its product, and ultimately to USO's economic downfall.
 
 
 6
 USO defaulted on the Citibank note in August 1989, and Corning paid Citibank pursuant to the Security Agreement. With Corning seeking repayment from USO and USO in dire financial straits, on December 12, 1989, Corning and USO entered into an"Extension and Standstill Agreement," under which, among other things, Corning agreed to give USO additional time to pay its obligation to Corning for satisfying the Citibank liability. The Agreement included a clause whereunder USO released Corning from all claims USO had against Corning, except those "with respect to such intellectual property rights which Debtor [USO] may have against Corning, if any." J.A. 140-41.
 
 
 7
 Nine months after signing the Extension and Standstill Agreement, Corning brought an action against USO in district court to recover the money it had paid to Citibank pursuant to the Security Agreement. USO did not answer, and the parties entered into a Stipulation and Settlement Order under which USO admitted its obligation. When USO failed to pay its obligation as required by the Settlement Order, the Court entered judgment for Corning and against USO for $ 1,606,362.55. Pursuant to its rights under the Security Agreement, Corning scheduled a public auction of the property of USO in which it had an interest. Shortly before the auction, Ace sent a memorandum to USO terminating the license to USO of his patent for Photo-glastic.
 
 
 8
 After the auction, USO effectively ceased doing business. On December 4, 1990, Corning filed an involuntary petition for relief against USO under Chapter 7 of the Bankruptcy Code.[1]
 
 
 9
 In 1991, USO, later joined by Ace, brought the instant case against Corning in Maryland state court. Corning removed the action to United States District Court for the District of Maryland. USO alleged breach of oral contracts, fraudulent inducement, unfair competition and breach of implied covenants of good faith and fair dealing. Ace's initial complaint raised similar claims of breach of contract, unfair competition and fraudulent inducement.
 
 
 10
 Appellants' myriad claims essentially boil down to the following. Appellants maintain that Corning required that the Photo-glastic meet unreasonably stringent standards[2] and that, by refusing to divulge the composition of the glass it supplied to USO, Corning prevented appellants from meeting Corning's standards, thereby dooming USO.
 
 
 11
 Although appellants used every weapon in their arsenal to avoid dismissal,[3] the district court eventually dismissed both appellants' claims. Essentially, the district court held that USO's claims were barred by the release in the Extension and Standstill Agreement and that Ace could not assert claims that, in reality, belonged to USO.
 
 
 12
 We review the district court's grants of summary judgment de novo. Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir.1993).
 
 II.
 
 13
 The district court found that USO's claims against Corning were barred by the release in the Extension and Standstill Agreement. The release reads as follows:
 
 
 14
 [USO[4]] hereby releases and discharges Corning, its officers, employees, agents and attorneys from any and all manner of claims or causes of action, however described, whether in law or equity, whether known or unknown, that against Corning or said parties Ace has or may have as of December 15, 1989 for or by reason of any cause, matter or thing whatsoever including without limitation claims or causes of action with respect to any and all actions or inactions heretofore by Corning in respect of [USO] or the Obligations and the Collateral and Corning's rights and interests therein; provided however that this Agreement does not in any way grant or convey to Corning any right, title, interest or license in any intellectual property rights (including, for example, inventions, trade secrets, know-how, copyrights, patents or patent applications) of [USO] nor does it waive or release any claim with respect to such intellectual property rights which Debtor [USO] may have against Corning, if any.
 
 
 15
 J.A. 140-41 (emphasis in original). USO argues that the release is inapplicable because its claims fall within the exception to the release. This argument is unpersuasive.
 
 
 16
 Paragraph 11 of the Extension and Standstill Agreement states: "This agreement shall be governed and construed in accordance with the laws of the State of New York." J.A. 142. Under New York law, "[t]he traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be established or else the release stands." Mangini v. McClurg, 249 N.E.2d 386, 390 (N.Y.1969). "When ... a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if 'the language of the release is clear, ... the intent of the parties [is] indicated by the language employed.' " Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc., 558 F.2d 1113, 1115 (2d Cir.1977) (alteration in original) (quoting In re Schaefer, 221 N.E.2d 538, 540 (N.Y.1966)). Moreover, "[w]hen the words of the release are of general effect the release is to be construed most strongly against the releasor." Mt. Read Terminal, Inc. v. LeChase Constr. Corp., 396 N.Y.S.2d 959, 960 (App. Div.1977)).
 
 
 17
 In challenging the applicability of the release, USO relies upon the exception to the general terms of the release, which explicitly states that USO does not "waive or release any claim with respect to [any] intellectual property rights which [USO] may have against Corning, if any." While the Photo-glastic product clearly figures in to all of USO's claims, USO does not allege that Corning interfered with or infringed its patent rights with respect to Photo-glastic; rather, USO's claims arise out of the long-term business relationship between USO and Corning and sound in contract and tort. Because USO's claims are not "claim[s] with respect to ... intellectual property rights,"[5] the exception is inapplicable and the general release bars USO from asserting them.
 
 
 18
 USO also raises several grounds for its conclusion that the release is unenforceable: ambiguity, duress, unconscionability and fraudulent inducement. We have reviewed these arguments and determined that none has any basis in either law and fact. We reject each as meritless. We have also examined USO's other claims of error and find them to be similarly devoid of merit. The district court, therefore, properly granted summary judgment to Corning with respect to USO.
 
 III.
 
 19
 In his complaint against Corning, Ace advanced claims for fraudulent inducement, breach of contract, unfair competition, unjust enrichment, and loss of patent life. The district court dismissed them all. We affirm the dismissal substantially on the reasoning of the district court.[6] We note, as did the district court, that Ace, in drafting his complaint, tried to overcome USO's release of claims against Corning by bringing the same claims in his own name. Ace's arguments that he has capacity to bring claims that are properly characterized as USO's as a third-party beneficiary of Corning's agreements with USO and as patent licensor are unpersuasive. While USO's release in no way precludes Ace from bringing any claims he, personally, may have against Corning, the fact remains that Ace may only recover to the extent that he, personally, has been damaged. Regardless of USO's execution of the release, Ace cannot create claims that entitle him to relief in his personal capacity simply by recasting claims belonging to USO in his own name.
 
 
 20
 With respect to claims properly brought by Ace in his own name, Ace alleges that Corning breached the oral agreements entered into with him in his personal capacity, and that Corning breached the implied covenant of good faith in those oral agreements and in the written agreement he entered into with Corning. We affirm the district court's dismissal of these claims as well.
 
 
 21
 First, Ace has failed to come forward with evidence supporting the existence of any oral agreement between Corning and Ace in his personal capacity.[7] See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Second, even were we to accept Ace's allegation of an oral agreement between Ace and Corning, and with respect to Ace's claim for breach of the covenant of good faith in the written agreement between Corning and Ace, we reject Ace's legal theory of recovery. Ace essentially contends that Corning breached a duty it owed to USO and Ace by refusing to divulge the composition of the glass it provided to USO. Corning, it is claimed, took this approach in the hope that USO would not survive and it (Corning) would be able to obtain the Photo-glastic patent. Of course, it is preposterous for Ace and USO to suggest that Corning breached an implied good faith duty to share its intellectual property rights in the composition of its glass with Ace and USO when, all the while, USO and Ace were intent on keeping the patent rights in the Photo-glastic to themselves.
 
 IV.
 
 22
 Ace claims that, because the parties had yet to engage in "meaningful discovery," the district court should not have granted summary judgment. See Celotex Corp. v. Catrett, 477 U.S. at 322 (summary judgment can be granted "after adequate time for discovery"). Because the dismissal of Ace's claims is predominantly the result of legal, and not factual, deficiencies, this claim of error is irrelevant. In any event, Ace offers no explanation as to why he failed to obtain discovery from the time he was added as a plaintiff in the Maryland state court action in September 1991 until the filing of the motion for summary judgment. Nor did Ace move, pursuant to Rule 56(f), for a continuance to conduct discovery necessary to defeat the summary judgment motion. Thus, Ace cannot now request a remand for an opportunity to conduct additional discovery. See Hayes v. North State Law Enforcement Officers Ass'n, --- F.3d ----, ----, 1993 U.S.App. LEXIS 27886, at * 31-* 34, 1993 WL 433339, at * 7 (4th Cir. Oct. 27, 1993). Moreover, the disingenuous nature of Ace's request is borne out by the fact that Ace fed the district court additional pieces of information after each adverse court decision. This behavior strongly suggests that any failure on the part of Ace to seek discovery was not in good faith.
 
 
 23
 Finally, the suggestion that, "due to the extraordinary facts and circumstances surrounding this case, summary judgment against USO and Ace should be reversed to correct manifest injustice," Appellants' Br. 38, is preposterous. Rather, because it is evident that appellants are grasping at straws, the judgment of the district court should be and hereby is
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 The bankruptcy court held that Corning's filing was not in bad faith and entered an order placing USO in Chapter 7. USO later converted its case from a Chapter 7 liquidation to a Chapter 11 reorganization
 USO appealed certain of the bankruptcy court's rulings to the district court, which affirmed. Subsequently, appeal was taken to this court, which affirmed the district court's affirmance. United States Optical, Inc. v. Corning Inc. (In re United States Optical, Inc.), 991 F.2d 792 (4th Cir.1993) (unpublished per curiam opinion, reported at 1993 U.S.App. LEXIS 6960, 1993 WL 93931 (4th Cir. Apr. 1, 1993)).
 
 
 [2]
 It is not clear, on the record, why Corning established these standards, nor why USO was bound to produce a product that met these standards
 
 
 [3]
 Notably, in opposition to various motions for summary judgment made by Corning variously against USO and Ace, appellants submitted affidavits of Ace which often contained new and sometimes contradictory information. Such practice, of course, runs contrary to the rules governing summary judgment and to honesty with the court, and is to be discouraged. Because we affirm the judgments of the district court even accepting all the affidavits of Ace, we have no need to resort, as we could, to considering only the timely and uncontradicted submissions of Ace. See Orsi v. Kirkwood, 999 F.2d 86, 91 (4th Cir.1993); Rohrbough v. Wyeth Lab., Inc., 916 F.2d 970, 975-76 (4th Cir.1990)
 
 
 [4]
 The actual agreement uses the term "Ace", which is defined in the agreement to mean "United States Optical, Inc., formerly, Ace Sophisticates, Inc." J.A. 135
 
 
 [5]
 The only conceivable relationship between USO's claims and any intellectual property is USO's claim of "loss of valuable patent life," as an element of damages arising from Corning's alleged wrongdoing. Such an allegation, even if it were valid (Ace, and not USO, is the owner of the patent in question), cannot convert USO's claims into "claim[s] with respect to ... intellectual property rights...."
 
 
 [6]
 In Count II, Ace alleged that Corning breached the implied covenants of good faith and fair dealing in the July 1986 agreements and in oral agreements by selling photochromic glass to competitors, and by failing to disclose either the composition of the glass products or how problems with the glass might be remedied. The district court held that, to the extent that this claim was identical to USO's claim, Ace was barred from bringing the claim by the doctrine of res judicata. This was error. While it may be that the president and/or principal shareholder of a corporation can be barred by res judicata from himself bringing similar claims where he controlled the corporation's litigation and the corporation's claims were rejected on the merits, here the only issue decided on the merits with regard to USO's claim was that the release barred recovery. This finding on this issue is simply not relevant to Ace, who did not execute any personal release. Nonetheless, we affirm the district court's judgment as discussed in the text
 
 
 [7]
 Ace alleges that "Ronald S. Ace, U.S.O., and Corning ... entered into certain oral agreements." J.A. 304. However, in his affidavit dated August 31, 1992, Ace mentions no oral agreements between Ace, in his personal capacity, and Corning, stating only: "As president of U.S.O., I entered into certain oral agreements with Corning on U.S.O.'s behalf." J.A. 283. In his (belated) affidavit dated February 28, 1993, submitted only in support of Ace's motion to alter or amend the district court's judgment of February 12, 1993, Ace states:
 Starting in 1985, both individually and as president of U.S.O., I entered into, not just one, but many Oral Agreements with Corning. One of these Oral Agreements provided that Corning would supply consultation, technical information, and access to Corning's vast "200 million dollar R & D facilities" to use if U.S.O. encountered any difficulties in developing the "Photo Glastic" product in exchange for U.S.O. sharing virtually all of the vital proprietary technical and marketing information with [executives and employees of Corning]. Similarly, even after signing the initial set of contracts with Corning ..., U.S.O. and I entered into many other Oral Agreements, each time relying on Corning's representations to maintain good faith, trust and high ethical standards throughout our relationship.
 J.A. 352 (emphasis added). With respect to the terms of the only oral agreement detailed, it is unclear, if in fact the agreement was in part between Corning and Ace, what benefit (other than benefit through USO) Ace received. Thus, the record indicates only agreements between Corning and USO.