[717 NYS2d 553]

Alon Gibli, Appellant, v Daniel Kadosh, Respondent.

First Department, December 5, 2000

36

APPEARANCES OF COUNSEL

*Marc A. Rapaport* for appellant.

*Elliot A. Cristantello* of counsel (*Leonard A. Robusto* on the brief; *Voute, Lohrfink, Magro & Collins, L. L. P.,* attorneys), for respondent.

### OPINION OF THE COURT

SAXE, J.

On this appeal, we are asked to determine whether a release signed by the plaintiff is a bar to this dental malpractice action.

The facts as alleged by the plaintiff are as follows. He had been in this country some months when he began experiencing pain in the left side of his mouth. Having seen the defendant's advertisement in a local newspaper, the plaintiff scheduled an appointment with him. The defendant recommended that if the pain continued, a molar on the lower left side of the plaintiff's mouth should be extracted; the defendant indicated that the extraction should take approximately a half hour. A few weeks later, on April 11, 1995, the defendant spent 2 to 2½ hours extracting the tooth, during which time the plaintiff needed about three short breaks to calm down. According to the plaintiff's deposition testimony, after the first 20 minutes of the procedure, "all hell broke loose." The defendant started to use brutal force, and the more brutal the force, the more explo-

sive the pain became. Ultimately, the defendant used what appeared to be a chisel and hammer to remove the tooth. The plaintiff left the defendant's office in excruciating pain, but was assured that the pain and severe swelling he was experiencing were normal. Meanwhile, the plaintiff was not able to fully open his mouth until about a month later, at which time he found that the left side of his tongue and left inner side of his face were completely numb. The defendant continued to assure the plaintiff that this condition should end within about three months.

When the numbness persisted, the plaintiff sought the advice of other oral surgeons who referred him to a specialist, Dr. Salvatore Ruggiero, the Program Director at the Long Island Jewish Hospital Department of Dental Medicine, Division of Oral and Maxillofacial Surgery. Based on his examination of the plaintiff on August 17, 1995, Dr. Ruggiero concluded that the plaintiff suffered from "severe axonotmesis," a nerve injury characterized by an intact nerve trunk with damage of varying degrees, involving numbness that can last for several months. It was Dr. Ruggiero's position that because four months had passed since the time of the injury, which period he considered the "outer limits of the window for surgical intervention," he "strongly recommend[ed] that [plaintiff] undergo surgical exploration with the intent to repair the lingual nerve." The plaintiff was informed that the surgery would cost $10,000, a sum he did not have.

Believing the defendant to be responsible for his condition, and therefore to have an obligation to pay for the necessary surgery, the plaintiff made numerous attempts to reach the defendant, but was unsuccessful. Finally, a friend of the plaintiff succeeded in speaking with the defendant, who then agreed to pay the cost of the surgery, on condition that the plaintiff sign a release. On August 28, 1995, the plaintiff signed the following release, which was prepared by his immigration lawyer:

"Dear Dr. Kadosh:

"This shall confirm my agreement with you regarding the following:

"You shall be responsible and promptly pay any and all costs relating to dental work to be performed on my mouth and teeth by Dr. Salvatore Ruggiero as a result of the work you performed April 11, 1995.

"If you shall promptly pay all costs relating to the above-referenced work, I hereby release you from any claims which I may have in connection with the work you performed on me on April 11, 1995."

The defendant then negotiated a reduction in the cost of the procedure from $10,000 to $3,000, by eliminating the proposed hospital stay.

The surgery was not successful. Rather, Dr. Ruggiero discovered that the lingual nerve could not be repaired because it had been completely severed during the extraction. Thus, Dr. Ruggiero changed the plaintiff's diagnosis from axonotmesis to neurotmesis, a permanent nerve injury. As a result, it is alleged, this now-30-year-old plaintiff is saddled with the permanent loss of sensation on the left side of his mouth and tongue, affecting his ability to taste and to speak, as well as his appearance, with resulting emotional and psychological ramifications as well. This lawsuit for dental malpractice ensued.

The defendant's motion for summary judgment was based upon the existence of the release. The Civil Court, to which this action was transferred from the Supreme Court, denied the defendant's motion, concluding that the plaintiff might have a viable claim to set aside the release based on mutual mistake. Appellate Term reversed and dismissed the complaint, holding that the evidence offered did not establish mutual mistake.

We now reverse and reinstate the complaint, holding that the plaintiff's evidence was sufficient to create a question of fact, precluding summary judgment dismissal.

■ We are aware that a release "is a jural act of high significance without which the settlement of disputes would be rendered all but impossible" (*Mangini v McClurg*, 24 NY2d 556, 563). It is well established that further litigation following a release should not be permitted "except under circumstances and under rules which would render any other result a grave injustice" (*id.*). "It is for this reason that the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be established or else the release stands. In the instance of mutual mistake, the burden of persuasion is on the one who would set the release aside" (*id.*; *see also, Touloumis v Chalem*, 156 AD2d 230).

In these circumstances, enforcing the release would indeed represent "a grave injustice." In the mutual misapprehension

that what was needed to repair the damage caused by the defendant was surgery that would cost $10,000, the plaintiff agreed to a deal by which the defendant would pay for the surgery, and the plaintiff, restored to something approximating his former health, would give up any claims against the defendant. If there had been any contemplated possibility that the injury was of a type that surgery *could not repair and correct*, there is no question that such deal would not have been considered.

The question here comes down to whether the information known to both parties at the time of the release precludes the possibility of mutual mistake.

The *Mangini* case drew a distinction between "[a] mistaken belief as to the nonexistence of presently existing injury" and a mistake "as to the consequence, future course, or sequelae of a known injury" (*Mangini v McClurg, supra*, at 564). In *Mangini*, the infant plaintiff was injured in an automobile accident and subsequently complained of lower back and left hip pain. All the physicians who examined the plaintiff prior to the settlement concluded that there had been no injury to the hip or femur, and that the pain was a symptom of lower back injury and nerve root irritation. However, within six months of signing a release, the plaintiff was diagnosed with a severe hip injury that was causally linked to the accident.

The Court in *Mangini* set aside the release, reasoning that the settlement had been based on the parties' mistaken belief that the only injury sustained by the plaintiff arising out of the accident was her back injury, as distinct from the separate hip injury that was subsequently diagnosed. As such, the case was said to "involve[ ] two distinct injuries flowing from the same accident, one known and one unknown" (*id.*, at 568).

It is inaccurate to describe what the plaintiff experienced here as merely the "consequence, future course, or sequelae of a *known injury*." Although the plaintiff did not suffer injuries at two distinct sites, the injury he was actually suffering from was substantially different from the injury that the parties believed existed, and not merely a sequela of a known injury. Both parties believed the plaintiff to be suffering from damage to an intact nerve, a treatable injury from which the attendant pain was expected to dissipate; the real injury, unknown to both parties at the time of the release, was a completely severed nerve, a condition untreatable and irreversible. The nature of the presumed injury is so different from that of the actual injury, it is not merely a matter of degree or severity

(greater pain or for a longer period). Although the parties knew the *location* of the damage, they misunderstood the *nature* of the damage. This differentiates the present matter from those relied upon by the defendant.

In *Calavano v New York City Health & Hosps. Corp.* (246 AD2d 317), relied upon by the defendant, the plaintiff was aware when he signed the release of the nature of his injury, a herniated disk at L4-L5, but was simply unaware that he would afterward experience severe pain from the injury, requiring emergency surgery. In contrast, in cases where the plaintiffs have been unaware of the exact nature of their injuries at the time they signed releases, those releases have been set aside. For instance, in *Curry v Episcopal Health Servs.* (248 AD2d 662), the plaintiff knew that her back was injured, but not that she had suffered an annular tear and other serious injuries. And, in *Carola v NKO Contr. Corp.* (205 AD2d 931), the release was set aside where the plaintiff was aware of back pain at the time of the release, but unaware of three herniated discs (*but see, Finklea v Heim,* 262 AD2d 1056 [release not set aside where an MRI showed the existence of a mid-line disc herniation after plaintiff settled personal injury action]).

It is clear from the previous analysis that the law does not preclude the setting aside of a release wherever the plaintiff is aware of the location or body part suffering the injury. Rather, if the plaintiff can demonstrate that the injury was of a different nature than that which both parties believed at the time of the release, a claim of mutual mistake is made out. Here, the motion court correctly concluded that the plaintiff's claim to set aside the release based upon mutual mistake should not be dismissed.

■ There are also triable issues with respect to whether the release is void as procured under duress or unconscionable circumstances. "Where fraud or duress in the procurement of a release is alleged, a motion to dismiss should be denied" (*Bloss v Va'ad Harabonim of Riverdale,* 203 AD2d 36, 37). In particular, "it is inequitable to allow a release to bar a claim where, as here, it is alleged that the releasor had little time for investigation or deliberation and that it was the result of overreaching or unfair circumstances" (*id.,* at 40). Here, the plaintiff's evidence supports a finding that as a practical matter, the defendant compelled him to execute the release by (1) representing, incorrectly, that his numbness was a very common, temporary side effect of an extraction, and (2) exploiting the plaintiff's belief that he was already at the end of the limited "window"

period in which corrective surgery was possible. The "choice" the defendant presented to the plaintiff was to continue to suffer indefinitely the pain directly caused by the defendant's tooth extraction technique, or to accept the defendant's offer to immediately pay for the surgery that they both believed would repair the damage and end the pain. For the defendant to take advantage of the situation to extract such a concession from the plaintiff may well be found to be "overreaching or unfair circumstances," making it inequitable to allow the release to bar a claim (*Bloss v Va'ad Harabonim of Riverdale*, 203 AD2d 36, 40, *supra*).

The allegations are sufficient to support a possible finding that the release signed by the plaintiff "was obtained under circumstances which indicate unfairness, overreaching and unconscionability" (*Rivera v Vickers*, 72 AD2d 807, 808; *Grenan v New York, New Haven & Hartford R. R. Co.*, 224 App Div 744 ["the exacting of a release from plaintiff under the circumstances was unconscionable upon the part of the defendant"]). Conduct that amounts to overreaching on the part of a professional in an attempt to avoid liability for malpractice is particularly egregious, and where it is shown, that professional should not be permitted to "reap the benefits of his own misconduct" (*Simcuski v Saeli*, 44 NY2d 442, 454).

Finally, the timing and circumstances of the release's execution, as well as the consideration it recites, also give the plaintiff a viable basis to challenge defendant's reliance upon the release as a complete defense (*see, Best v Yutaka*, 90 NY2d 833).

Accordingly, the order of the Appellate Term of the Supreme Court, First Department, entered July 13, 1999, which reversed an order of the Civil Court, New York County (Martin Shulman, J.), entered on or about July 1, 1998 and granted the defendant's motion for summary judgment dismissing the complaint, should be reversed, on the law, without costs, the motion denied and the complaint reinstated.

SULLIVAN, P. J., NARDELLI, RUBIN and FRIEDMAN, JJ., concur.

Order of the Appellate Term of the Supreme Court, First Department, entered July 13, 1999, which reversed an order of the Civil Court, New York County, entered on or about July 1, 1998 and granted defendant's motion for summary judgment dismissing the complaint, reversed, on the law, without costs, the motion denied and the complaint reinstated.