Edwena R. HEGNA, as Executrix of the Estate of Charles Hegna, Late of Sterling, Virginia, and individually and Steven A. Hegna, Craig M. Hegna, Lynn Marie Hegna Moore, and Paul B. Hegna, Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN and The Iranian Ministry of Information and Security, Defendants.

No. 11 MC. 5 (JSR).

United States District Court, S.D. New York.

March 11, 2011.

Ralph Paul Dupont, The Dupont Law Firm, LLP, Stamford, CT, for Plaintiffs.

## MEMORANDUM ORDER

JED S. RAKOFF, District Judge.

Plaintiffs are the widow and children of Charles Hegna, an American diplomat murdered in a 1984 airplane hijacking orchestrated by Hezbollah, a terrorist organization with links to the Islamic Republic of Iran ("Iran"). In April 2000, plaintiffs filed an action in the United States District Court for the District of Columbia pursuant to a provision of the 1996 Antiterrorism and Death Penalty Act that amended the Foreign Sovereign Immunities Act ("FSIA") to revoke the sovereign immunity of nations that sponsor terrorism. *See* 28 U.S.C. § 1605(a)(7); *see also Hegna v. Islamic Republic of Iran,* 402 F.3d 97, 98 (2d Cir.2005). As the Government of Iran never appeared in the action, the Court for the District of Columbia awarded plaintiffs a default judgment of $42,000,000 in compensatory damages and $333,000,000 in punitive damages. *See Hegna v. Islamic Republic of Iran,* No. 1:00CV00716 (D.D.C. Feb. 7, 2002). Seeking to enforce this judgment, plaintiffs registered it with this Court and requested an order attaching the former New York residence of the Consul General of Iran (the "Consular Property"), a property currently held by the United States Office of Foreign Missions and leased to a private party.

In March 2003, however, plaintiffs applied for partial satisfaction of the judgment pursuant to the Victims of Trafficking and Violations Protection Act ("VTVPA"), as amended by the Terrorism Risk Insurance Act ("TRIA"), which authorizes the United States Government to make payments from certain designated sources of money to judgment holders who have obtained damage awards against countries that sponsor terrorism. *See* VTVPA, Pub. L. No. 106–386, § 2002, 114 Stat. 1464, 1541–43 (2000); TRIA, Pub. L. No. 107–297, § 201, 116 Stat. 2322, 2337–

40 (2002). As a condition of accepting partial payment under the VTVPA, plaintiffs executed releases stating in relevant part: "I hereby relinquish (1) all rights and claims to punitive damages awarded in connection with the claim or claims I brought under 28 U.S.C. 1605(a)(7) and any related interest, costs, and attorneys fees, and (2) all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal or that is the subject of awards by such tribunal." *See* 68 Fed. Reg. at 8,080–81. Plaintiffs thereafter received two pro rata payments from the United States Treasury Department, together totaling more than $8 million, from the sources of funds designated in the VTVPA.

In light of the partial satisfaction of plaintiffs' judgment and the terms of the releases executed by plaintiffs in connection therewith, this Court denied plaintiffs' application for an attachment of the Consular Property. *See Hegna v. Islamic Republic of Iran,* 299 F.Supp.2d 229 (S.D.N.Y.2004). The Court found that the releases clearly applied to victims who had accepted less than the full amount of compensatory damages awarded in the underlying judgment, and that plaintiffs were barred from attaching the Consular Property because it was "at issue" before the Iran–United States Claims Tribunal (the "Tribunal"). *Id.* The Second Circuit affirmed the Court's judgment, although it modified the decision such that the case was dismissed without prejudice to allow for the possibility that plaintiffs might wish to reassert their claims should the action before the Tribunal be resolved.

Although Iran's claim of entitlement to the Consular Property is still pending before the Tribunal,[1] plaintiffs filed an Order to Show Cause on September 27, 2010[2] once again seeking to attach and levy upon the Consular Property. On January 11, 2011, plaintiffs moved to amend the Order to Show Cause to delete language providing for service of the Order on Iran. While Iran has not entered an appearance in this matter, the United States Government has intervened and opposes both the attachment of the Consular Property and plaintiffs' contention that service on Iran is not required. For the reasons explained below, the Court agrees with the Government that intervening changes in the law have not nullified plaintiffs' release of "all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal or that is the subject of awards by such tribunal." Accordingly, the Court concludes that plaintiffs are still barred from attaching the Consular Property, and that their renewed Order to Show Cause is without merit. Having so determined, the Court need not reach the issue of whether diplomatic service of a post-judgment enforcement proceeding is required in the instant action.

Plaintiffs argue that attachment of the Consular Property is now proper because of subsequent changes to the FSIA. Specifically, section 1083 of the National Defense Appropriations Act for Fiscal Year 2008 ("NDAA"), Pub. L. No. 110–181, § 1083, 122 Stat. 3, 338–44, repealed the original state sponsor of terrorism exception—28 U.S.C.S. § 1605(a)(7)—and enacted in its place a new exception—28 U.S.C.S. § 1605A—that is in many ways more favorable to plaintiffs. As summarized in *In re Islamic Republic of Iran Terrorism Litig.,* 659 F.Supp.2d 31

---

1. *See* Government's "Statement of Interest of the United States Regarding Attachability of Consular Property" ("Statement of Interest") at 15.

2. The Order to Show Cause was issued on September 28, 2010 by the Honorable Colleen McMahon, sitting in the Miscellaneous Part of this Court.

(D.D.C.2009), Section 1605A "(1) furnishes a [new federal] cause of action against state sponsors of terrorism; (2) makes punitive damages available in those actions; (3) authorizes compensation for special masters; and (4) implements new measures designed to facilitate the enforcement of judgments." 659 F.Supp.2d at 58–59. Among other things,

> [Section] 1605A entitles plaintiffs to what are in effect automatic pre-judgment liens on property belonging to a designated state sponsor of terrorism. In addition to these new pre-judgment attachment procedures, any actions filed or otherwise maintained under § 1605A may benefit from certain reforms to § 1610, which is the section of the FSIA that prescribes the limited circumstances in which the property of a foreign state may be subject to attachment or execution upon a civil judgment. Specifically, § 1083 of the 2008 NDAA adds to § 1610 new provisions that are plainly intended to limit the application of foreign sovereign immunity or United States sovereign immunity as defenses to attachment or execution with respect to property belonging to designated states sponsors of terrorism.

*Id.* at 62 (footnote omitted). Section 1083 of the NDAA also authorizes plaintiffs who brought "prior actions" under Section 1605(a)(7) to convert them to the new federal right of action, provided certain conditions are met. *See* NDAA § 1083(c)(2). On April 29, 2010, the United States District Court for the District of Columbia granted the Hegnas' motion to convert their judgment pursuant to NDAA § 1083(c)(2). *See Hegna v. Islamic Republic of Iran,* Civil Action 00–716(HHK) (D.D.C. Apr. 29, 2010).

Plaintiffs argue that the conversion of their judgment from Section 1605(a)(7) to Section 1605A in effect nullifies their earlier release of rights. The first clause of the release provides that plaintiffs relinquish "all rights and claims to punitive damages awarded in connection with the claim or claims I brought under 28 U.S.C. 1605(a)(7)." *See* 68 Fed. Reg. at 8,080–81. Plaintiffs highlight the fact that this relinquishment is limited to *punitive damages* brought under Section *1605(a)(7).* However, the second clause is not so limited, for it provides for the relinquishment of *"all rights* to execute against or attach property that is at issue in claims against the United States before an international tribunal or that is the subject of awards by such tribunal." *Id.* (emphasis supplied). Notwithstanding this broad language, plaintiffs argue that attachment rights only exist if there is a judgment to be attached upon. *See* 02/25/11 Transcript. They contend that because the law that placed restrictions on the original judgment has been altered and plaintiffs are now proceeding under a new basis for attachment, the second clause should not be read as operative. *Id.*

The Court is unpersuaded by this argument. In a typical settlement agreement, the object of a release is to buy the defendant peace from further litigation. *See, e.g.,* 19A N.Y. Jur. 2d *Compromise, Accord, and Release* § 75 (2010) ("It is the general rule that a release constitutes a defense or bar to an action on the claim or prospective claim which was the subject of the release."). To achieve this goal, standard release forms require signatories to relinquish all rights until the end of time.[3]

---

3. *See, e.g., DeQuatro v. Zhen Yu Li,* 211 A.D.2d 609, 621 N.Y.S.2d 369, 370 (1995) ("The release signed by the plaintiff contained broad all-inclusive language and was set out in clear and unmistakable terms. It provided

that the plaintiff 'releases and discharges ... [the] release ... from all actions, causes of action, suits, debts, dues, sums of money ... controversies ... trespasses, damages, judg-

The fundamental purpose of a release would be utterly defeated, therefore, if every relinquishment of rights were automatically nullified upon a change in the law.[4] In this case, the broad language of the second clause of plaintiffs' releases evinces the Government's intent to buy itself peace from further complications with respect to property at issue before international tribunals.[5] Subjecting such property to attachment by private parties could hinder the United States in its negotiations with sovereign nations and otherwise undermine its conduct of foreign affairs. To prevent such an undesirable outcome, the Government paid plaintiffs $8 million in exchange for plaintiffs' relinquishment, *inter alia*, of "all rights" to execute against property at issue before an international tribunal. Plaintiffs have cited no authority for the proposition that

a subsequent change in the law renders this agreement inoperative.

Nor is there anything in the NDAA to suggest otherwise. The NDAA does not expressly repeal the effect of relinquishment made under VTVPA § 2002. Additionally, as the Government argues, the NDAA does not impliedly repeal Section 2002, as "[a]n implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute." *Lockhart v. United States*, 546 U.S. 142, 149, 126 S.Ct. 699, 163 L.Ed.2d 557 (2005) (quotation marks and citation omitted). In this case, there is no irreconcilable conflict between the NDAA and VTVPA § 2002(d)(5), nor does the NDAA evidence a clear intent to operate as a substitute for VTVPA § 2002(d)(5).

---

ments, extents, executions, claims, and demands whatsoever ... which against the releasee, the releasor ... ever had, now have, or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this release'.... Such language was plain and unambiguous and the plaintiff having wilfully subscribed to the release cannot now avoid the obligation....").

**4.** *See, e.g., Anita Foundations, Inc. v. ILGWU Nat'l Retirement Fund*, 902 F.2d 185, 189 (2d Cir.1990) ("[It is] the established rule that a change in the law does not render an agreement void."); *In re Napolitano*, No. 07–73361–478, Chapter 7, 2008 WL 5401541, at *4, 2008 Bankr.LEXIS 3520, at *10 (Bankr. E.D.N.Y. Dec. 23, 2008) ("While the turnover of the cash surrender value would significantly impact the Debtors financially given the Second Circuit's ruling in *Wornick v. Gaffney*, [544 F.3d 486 (2d Cir.2008)] it is well settled that a subsequent change in law cannot be used to set aside a written agreement."); *Kinney v. Kinney*, 48 A.D.2d 1002, 1002, 369 N.Y.S.2d 258, 260 (4th Dep't 1975) ("Contract obligations are determined by the law in force at the time the contract is executed...."); *Wilson v. New York City Transit Authority*, 115 Misc.2d 1017, 454 N.Y.S.2d

962 (N.Y.Civ.Ct.1982) ("The court holds that the agreement between the parties is binding and plaintiff cannot use a subsequent change in law to set aside a written agreement evidenced by the executed release."), *aff'd*, 124 Misc.2d 839, 480 N.Y.S.2d 298 (N.Y.App. Term 1984); *see also Mangini v. McClurg*, 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 249 N.E.2d 386 (N.Y.1969) ("This is not to say that a release may be treated lightly. It is a jural act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice. It is for this reason that the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be establish or else the release stands.")

**5.** Plaintiffs' release also specifies that their relinquishments are irrevocable. *See* 68 Fed. Reg. at 8080–81 ("I understand that the relinquishment that I make is irrevocable once the payment is credited to the bank account I have identified in this application.").

The Court thus concludes that the second clause of plaintiffs' releases remains operative notwithstanding the conversion of plaintiffs' judgment pursuant to Section 1083 of the NDAA. The Court has considered the remainder of plaintiffs' arguments and finds them without merit. Accordingly, plaintiffs' application for an attachment is hereby denied, and the case is dismissed without prejudice to any action plaintiffs might bring once the matter is not pending before an international tribunal. Clerk to enter judgment.

SO ORDERED.