CONSORCIO PRODIPE, S.A. de C.V. and Patrick Mery–Sanson de Wallincour, Plaintiffs,

v.

VINCI, S.A., Compagnie Generale de Batiment et de Construction, Renaud Bentegeat and Antoine Zacharias, Defendants.

No. 06 Civ. 5618(PKC)(HBP).

United States District Court, S.D. New York.

March 12, 2008.

Lawrence Walker Newman, Nicole Dolenz-Extale, Baker & McKenzie LLP, NY, NY, Susan Rigmor Knox, Susan R. Knox, Esq., London, for plaintiffs.

Robert L. Sills, Orrick, Herrington & Sutcliffe LLP, New York, NY, for defendants.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

Plaintiffs bring two claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, alleging: 1) a pattern of racketeering activity that included defrauding a group of French banks, the Mexican government, the French government and plaintiffs; and 2) conspiracy to engage in a pattern of racketeering activity. Plaintiffs allege that the pattern of racketeering activity included the fraudulent inducement of plaintiffs to release claims against the defendants in this action.

The defendants have come forward with evidence that plaintiffs validly released all claims asserted against them in this action, including fraud-based claims. Plaintiffs' evidence fails to dispute any material facts relating to the validity, enforceability or scope of the releases. For the reasons outlined below, defendants' motion for summary judgment is granted.

I. *Background*

a. The Parties and the Project

The underlying dispute emanates from almost two decades of unsuccessful attempts to finance and develop a marina project in Puerto Loreto, Mexico (the "Project"). The recounting of the history of the Project, the relationship of the parties and the nature of the dispute is useful to an understanding of the documents which defendants assert released the plaintiffs' claims against them.

For the purposes of defendants' motion, I have accepted as true plaintiffs' version of the facts and such other facts offered by defendants that are not disputed by plaintiffs. All reasonable inferences have been drawn in plaintiffs' favor.

Plaintiff Consorcio Prodipe S.A. de C.V. ("Consorcio") is a corporation organized under the laws of Mexico and the wholly-owned subsidiary of Prodipe, Inc. ("Prodipe"), a Cayman Island's corporation. Plaintiff Patrick Mery–Sanson de Wallincour is a citizen of Mexico. Defendant Vinci S.A. ("Vinci") is a corporation organized under the laws of France. Defendant Compagnie Generale de Batiment et de Construction ("CBC") is a company organized under the laws of France and is 90% owned by Vinci. Defendants Renaud Bentegeat and Antoine Zacharias are both individual citizens of France.

In the late 1980s, Mexico eased restrictions on the length of time that watercrafts owned by non-Mexican nationals could remain in Mexico. Seeing opportunity in the regulatory relaxation, Mery–Sanson and J. Alejandro Weinstock Kletzel conceived a plan to transform, Puerto Loreto, an undeveloped part of the southeast coast of Baja California, Mexico, into a yacht marina and world-class resort. (Compl. ¶¶ 16–17; Mery–Sanson Decl. ¶ 3.) To that end, Mery–Sanson and Weinstock purchased from the Mexican tourism authority, Fondo Nacional de Fomento al Turismo, known as FONATUR ("FONATUR"), the right to use several hundred acres of land for the Project. (Compl. ¶ 18; Mery–Sanson Decl. ¶ 6.) The land-use rights were placed into six subsidiary corporations of Consorcio, the Mexican corporation (wholly-owned by Prodipe) created to manage the Project. (Compl. ¶ 21; Mery–Sanson Decl. 5–6.)

Between 1989 and 1992, Weinstock and Mery–Sanson undertook the preliminary excavation of the site, which included, among other things, the construction of canals and the diversion of a river, (Compl. ¶ 24.) In 1990, Prodipe borrowed $2.5 million from the French bank, Banque de l'Union Europeenne ("BUE") to begin developing the Project. (Compl. ¶ 27; Mery–Sanson Decl. ¶ 9.) The loan was guaranteed by Mery–Sanson, Weinstock and another individual. In addition to providing a loan to Prodipe, BUE agreed to contribute $10.05 million and become a 17.6 percent shareholder in the Project. (Compl. ¶ 28; Mery–Sanson Decl. ¶ 9.) BUE suggested to Mery–Sanson that an economical way to further finance the Project would be to use French government export financing, whereby a French state-owned entity called, Compagnie Francaise d'Assurance pour le Commerce Exterieur ("COFACE"), would guarantee loans made to the Project for up to 85% of the Project cost. (Mery–Sanson Decl. ¶ 14.) Because the purpose of COFACE was to promote the export of French products and services, the financing banks for which it would provide guarantees would have to be French. (*Id.* ¶ 10.) BUE also suggested that a French construction company, CBC, be contacted to become involved in the Project. (*Id.* ¶ 11.) CBC was contacted and after visiting the Project site, it expressed interest in the Project and a will-

ingness to help with financing. CBC provided $7 million to the Project with the expectation that it would become the main supplier of products and services to the Project. (*Id.* ¶ 11.) The financing plan conceived by the Project partners called for the French bank loans to be guaranteed by FONATUR as well as COFACE. (*Id.* ¶ 14.)

In October 1992, after CBC had provided $7 million to the Project, Consorcio, CBC and a French construction management company called, Setec Batiments, entered into a $48 million service and supply contract for the construction of hotels, condominiums, a golf course and the infrastructure to support such improvements. (Compl. ¶ 34; Mery–Sanson Decl. ¶ 11–13.) CBC's $7 million contribution was converted into equity in Consorcio making CBC part owner of the Project. (Compl.¶ 34.)

Representatives of CBC communicated to Mery–Sanson and the other Project partners that the only way the COFACE loan guarantees could be obtained for the Project was if CBC, a French company, gained full control of the Project development. (Mery–Sanson Decl. ¶ 15.) At some point in early 1993, it was agreed among the Project partners that *CBC* would take control of the project and supply the capital and financing required. (Compl.¶ 37.) At that time, the partners, or shareholders of Prodipe, included: Mery–Sanson and Weinstock, who held 70.12 percent through their company called Unis Group, Inc.; CBC, which held 12.26 percent; BUE's successor-in-interest, Compagnie Financiere de CIC et de l'Union Europeene ("CIC–UE"), which held 17.60 percent and a company called Grupo Rimo S.A. de D.V., which held a .02 percent interest. (Compl.¶¶ 53–54.) In a 1993 Memorandum of Understanding ("MOU"), the owners of Prodipe, Inc., the parent company of Consorcio, designated CBC as "Owner's Delegate," to more effectively "facilitate the communication and relationship between the different persons or companies involved in the Project...." (Dolenz–Extale Decl., Exh. 6.) The "Owner's Delegate" was "mandated by the others to carry out all aspects of the Project and act as the owner's sole delegate." (*Id.*; Compl. ¶ 49.) CBC agreed "to bring the necessary capital in whole or in part to ensure that such loans are activated." (*Id.*) CBC also agreed to "carry out its duties as defined hereabove keeping in mind the interest of the Owner and of its fellow shareholders, and shall not be entitled to any financial compensation, except for out-of-pocket expenses." (Dolenz–Extale Decl., Exh. 6.)

Pursuant to the MOU, all project owners other than CBC were required to place their shares of the Project into an irrevocable voting trust for three years so that CBC would be free to manage the Project as it saw fit. (Compl. ¶ 50; Dolenz–Extale Decl., Exh. 6.) Plaintiff Mery–Sanson was named chairman of Consorcio's board of directors pursuant to the MOU, but his role was limited to "interfacing between CBC and the Mexican government." (Compl. ¶ 51; Mery–Sanson Decl. ¶ 18.)

Plaintiffs allege that after entering into the MOU, CBC represented to FONATUR that it would provide a $7.5 million capital contribution to Consorcio to enable construction to begin. (Mery–Sanson Decl. ¶ 20.) This representation was not disclosed to plaintiffs at the time it was made, (*Id.*) In early 1993, however, CBC determined that it no longer wanted involvement with the Project and instead desired to focus attention on CBC's European projects. (Compl.¶ 61.) CBC's changed focus resulted in a substantial slowing of the Project's progress. FONATUR took notice of the Project's lack of progress and indicated that it would not

allow the Project to draw upon any of the loans it was guaranteeing unless CBC contributed $7,580,000 of its own money, as it had allegedly promised to do. (*Id.* ¶ 62.) Plaintiffs assert that CBC unilaterally and without the knowledge of the other Project partners, opened a Chemical Bank account in New York under the name Consorcio, and on June 25, 1993, transferred $7,378,300 into that account from a Chemical Bank account it controlled in Paris. (Dolenz–Extale Decl., Ex. 8; Mery–Sanson Decl ¶ 21; Compl. ¶¶ 63–65.) CBC then stated to FONATUR that it had made a capital contribution to Consorcio in the amount of $7,378,300 and FONATUR responded by allowing CBC to draw $7.2 million of the guaranteed loans as an advance payment for work to be done under the Service and supply agreement. (Mery–Sanson Decl. ¶ 24; Compl. ¶ 64.) Five days after the deposit was made, the $7,378,300 was transferred back to CBC's Paris account and none of those funds were ever used for the Project. (Mery–Sanson Decl. ¶ 22; Compl. ¶ 67.)

Plaintiffs hypothesize that CBC transferred the $7,378 million to a New York bank account under the name Consorcio to create the illusion that it had injected capital into the Project so that it could recoup its initial $7 million investment by drawing on the guaranteed loans to prepay itself for services it was to perform under the service and supply contract. (Compl. ¶¶ 66–67; Chevasco Decl. ¶ 8.) This "round-trip" transaction, as plaintiffs have labeled it, effectively enabled CBC to extract itself from the Project and divest itself of any interest in the Project. (Mery–Sanson Decl. ¶ 32; Chevasco Decl. ¶ 8.)

In February 1994, the General Manager of CBC, Rolland Guerin, met with the Director of FONATUR, Mario Beteta, who told Guerin that FONATUR was suspending the Project from drawing further upon the French bank loans. (Comp.¶ 83.) After the meeting, FONATUR wrote to Guerin confirming that Guerin had stated during the meeting that CBC was no longer interested in participating as a majority partner in the Project. (*Id.* ¶ 86.) The letter further stated that FONATUR required an accounting of approximately $14.9 million that CBC had received from both Consorcio and the French banks. (*Id.*) Plaintiffs were, at the time, unaware of these communications.

In March 1994, a meeting was held at the offices of FONATUR where Mery–Sanson presided as Chairman of Consorcio and complained about the lack of funds to move forward with Project. (*Id.* ¶ 89.) Beteta said that certain of the loaned funds were being retained by CBC. (*Id.*) Guerin responded that he did not know what had been done with the previously-advanced funds and that CBC could no longer be responsible for the Project other than to provide moral support. (*Id.*) He then recommended that the Project be taken over by FONATUR. (*Id.*) Beteta represented that he would take over the Project on behalf of FONATUR which resulted in Mery–Sanson tendering his resignation as chairman of the board of Consorcio so that Beteta could take control. (*Id.* ¶ 90.)

At some point prior to 1996, CIC–UE came to learn that Weinstock, Mery–Sanson's original Project partner, had misused part of the $2.5 million loan made by BUE and this information caused CIC–UE to attempt to foreclose on the loan that was personally guaranteed by Mery–Sanson, Weinstock and others. (Mery–Sasnson Decl. ¶¶ 17, 33.) Eventually, also prior to 1996, CIC–UE successfully foreclosed on the loan and took control of the shares owned by the loan's guarantors. (*Id.* ¶ 34.)

In or about the middle of 1994, Guerin left CBC and was replaced by defendant Renaud Bentegeat. (Mery–Sanson Decl. ¶ 29.) Bentegeat, as the new manager of CBC, expressed to Mery–Sanson, that CBC was still committed to the Project despite CBC's previous apparent lack of interest that was expressed through Guerin. (*Id.*).

By June of 1995, CBC had again lost interest in the Project, but claimed its lack of performance as construction service provider was due to FONATUR's refusal to provide funds. (Compl. ¶¶ 97–98.) Plaintiffs allege this claim was false and was made at the direction of defendants Antoine Zacharias (a CBC manager) and Bentegeat so that it could retain the funds it had already received in connection with the Project for as long as possible. (*Id.*)

By the end of 1995, all progress on the Project had ceased and disputes had broken out among the Project participants. CBC, through Bentegeat, told Mery–Sanson that CBC wanted to leave the Project "because of business activities of greater importance outside Mexico." (Mery–Sanson Decl. ¶ 30.) Plaintiffs later learned, however, that CBC wanted out of the Project because it had ruined its relationship with FONATUR through dishonest dealings. (Pl. Mem. at 6.)

A meeting between CBC and Mery–Sanson was held and they agreed to a protocol that called for CBC's conveyance of 100 percent of Prodipe, Inc.—the parent/owner of Consorcio—to Mery–Sanson after CBC purchased the shares owned by CIC–UE. (Mery–Sanson Decl. ¶ 35.) According the protocol, the transfer of the Project to Mery–Sanson would only occur if, among other things, CIC–UE would convey to CBC all of its shares in Prodipe and only if

Weinstock would release and waive all claims against Prodipe, Consorcio and its subsidiaries and release all of his rights and claims against, *inter alios*, Mery–Sanson and CBC. (Compl. ¶ 104.)

### b. The 1996 Agreements

On April 12, 1996, the various parties with an interest in the Project entered into agreements, including: a "Share and Loan Purchase Agreement," a "Share Purchase and Settlement Agreement," an "Escrow Agreement" and several general releases (collectively, the "1996 Agreements"). (Sills Decl., Exhs. F–J; Dolenz–Extale Decl., Exh. 10.)

Pursuant to the Share Purchase and Settlement Agreement, CBC purchased from CIC–UE all its shares in the Project and the rights to the $2.5 million loan that CIC–UE's predecessor-in-interest had made to Prodipe that was guaranteed by Mery–Sanson and Weinstock. (Dolenz–Extale Decl., Exh. 10 §§ 1.01–2.02.) Both the common shares and preferred shares that CIC–UE owned were sold to CBC, each for $1, and the $2.5 million loan was sold to CBC for $2.5 million. (*Id.*)

Pursuant to the Share and Loan Purchase Agreement, CBC sold 100 percent of the shares of Prodipe to Management Investment Funding, Limited ("MIF"), a company owned and controlled by Mery–Sanson, and two individual Mexican investors.[1] (Compl. ¶ 47; Mery–Sanson Dep, at 12; Pl. 56.1 Resp. ¶ 13.) MIF was to pay $1,100,000 for the Prodipe shares, $900,000 to extinguish a loan CBC had made to Prodipe and $1 for the rights to the $2.5 million loan originally made by CIC–UE's predecessor to Prodipe. (Sills Decl., Exh. F, § 2.01.) In addition to conveying owner-

---

1. Although two individual investors, along with MIF, were purchasers under the 1996 Agreements, plaintiffs now assert that the two individuals were acting as agents for an undisclosed principal, (Dolenz–Extale Decl, Exh. 4 ¶ 4.)

ship of the Project to Mery–Sanson's company, MIF, CBC was also required, pursuant to the 1996 Agreements, to make a contribution of $600,000 to a litigation escrow fund to be used by MIF to settle the Weinstock claims of ownership in Prodipe. Section 3.03 of the Share and Loan Purchase Agreement required, *inter alia*, releases of CBC and its former and current employees by Consorcio and Mery–Sanson. (*Id.* §§ 3.03(d), 3.04(b), (d).)

Pursuant to sections 3.03 and 3.04, in two separate documents, both Mery–Sanson and Consorcio—the plaintiffs in this action—released defendant CBC and its current and former employees, from all claims related to the Project. (Sills DecL Exhs. G and H.) It is undisputed that defendants Bentegeat and Zacharias were current employees of CBC at the time. (Compl. ¶ 98; Mery–Sanson Decl. ¶ 30.) Each document is signed by Mery–Sanson either in his personal capacity or as Consorcio's president. Each document-one a release by Consorcio and its subsidiaries (Sills Decl. Exh. G), the other a release by Mery–Sanson (Sills Decl. Exh. H)—is titled "General Release of Compagnie Generate de Batiment et de Construction, S.A." Each document purports to release, among others, CBC, its subsidiaries, affiliates and their respective former and current stockholders, directors, officers and employees from:

> [A]ny and all actions, causes of actions, suits ... claims and demands whatsoever ... whether known or unknown, contemplated or not contemplated, foreseen or unforeseen, existing or which may arise in the future, fixed or contingent, matured or unmatured (collectively, the *"Claims"*) that the RELEASOR ever had now has or hereafter can, shall or may have ... relating to or touching upon the development of a resort project

in Puerto Loreto, Baja Sur, California, Mexico ....

(Sills DecL Exh. G at 2–3, Exh. H at 1–2.)

Each release also states that the released claims include those relating to: a) any agreements between CBC and Consorcio and Mery–Sanson in anyway relating to the Project; and b) any actions taken by CBC (and any of its current or former employees) in its capacity as an officer or director or Consorcio or Prodipe. (Sills Decl, Exhs. G at 3; H at 2.) In addition, the releases state that the releasors have consulted with counsel and have read the terms of the releases and understand them. (Sills Decl., Exhs., G at 4, H at 3–4.)

### c. Weinstock's Allegations At the Time of the 1996 Agreements

Prior to the negotiation of the 1996 Agreements, Weinstock had asserted his claims of ownership over the shares. Contemporaneous with the execution of the 1996 Agreements, MIF, CBC and two individual investors who were parties to the Share and Loan Purchase Agreement, executed a separate agreement in which they acknowledged awareness of a facsimile from Truman Bodden & Company, a law firm located in the Cayman Islands that had been requested to provide an opinion relating to the 1996 Agreements. (Weisberg Dep. at 52, 56–57.) The facsimile included a letter from Weinstock in which he objected to any proposed transaction involving Prodipe because he asserted that, through his companies, he was the majority shareholder of Prodipe. (Sills Decl., Exh. K.) Because of Weinstock's continued claim of ownership, the parties to the Share and Loan Purchase Agreement acknowledged that they had received a copy of the fax containing Weinstock's letter and were "fully aware of the circum-

stances and implications of the matters described therein." (*Id.*)

Although the acknowledgement of the Weinstock letter was signed on behalf of MIF by Martin Weisberg pursuant to a power of attorney, Mery–Sanson was also aware of Weinstock's claim of ownership. (Weisberg Dep. at 52–57; Mery–Sanson Dep. at 70–79; *see also* Plaintiffs' Rule 56.1 Response ¶ 20 ("Throughout the negotiation of the 1996 Agreements, the parties were aware that Weinstock disputed the ownership of the shares to be transferred.").) On March 5, 1996 (approximately one month prior to the execution of the 1996 Agreements), Mery Sanson executed and faxed an agreement to Weisberg authorizing him to negotiate with Weinstock regarding "a settlement of the interest, if any, of Weinstock ... in the Project ...." (Sills Decl., Exh. J at 3.) In addition, Weinstock's claim against the shares that were the subject of the 1996 Agreements was acknowledged in the Share and Purchase Agreement as follows:

> [A]ll of CBC's rights and interest in and to the Commons Shares, free and clear of any lien, other than any claim by Weinstock, Balli or Calex Ltd., ... or any other party acting on their behalf challenging CFCIC–UE's or CBC's rights to interest in and to the Common Shares.

(Sills Decl., Exh. F., § 3.02(b).)

d. Events Subsequent to the 1996 Agreements

After gaining full control of the Project subsequent to the execution of the 1996 Agreements, Mery–Sanson attempted to move the Project forward with the help of FONATUR. (Compl.¶ 125.) The Project was impeded, however, by Weinstock's

1996 commencement of a civil lawsuit in Mexico City wherein he claimed his shares of Prodipe had been wrongfully taken from him. (Compl.¶ 127.) Because of the lawsuit, plaintiffs found it impossible to find investors willing to invest in the Project.[2] (*Id.* ¶ 128.)

In 1997, defendant Vinci acquired approximately 90 percent of CBC's shares from its former parent company, Compagnie Generale des Eaux. (*Id.* ¶ 13.) After the change in ownership, CBC's operations were taken over by other Vinci entities and CBC ultimately ceased to operate, though it continued to exist as a legal entity. (Compl.¶¶ 13, 79–81.)

In or about December 1998, Weinstock filed a criminal complaint against Mery–Sanson, CBC and other individuals and entities involved in the Project. (*Id.* ¶ 129.) Although, under Mexican law, criminal complaints or *"denuncias"* are kept secret, Mery–Sanson learned about the complaint as early as 2000. (Mery–Sanson Dep. at 95.) FONATUR used Weinstock's criminal complaint against Mery–Sanson as a model to make its own criminal complaint against Mery–Sanson and others. (Chauveau Dep. at 34–35.) Mery–Sanson responded in writing to Weinstock's criminal complaint and also sent a handwritten memorandum to defendant Bentegeat, discussing various lawsuits relating the Project and suggested that CBC should participate in a joint defense agreement with him. (Sills Decl., Exhs. T, U at 1–3, 7–9, 14–20, 22–23; Mery–Sanson Dep. at 96–101.) Mery–Sanson also communicated to CBC that he was seeking a financial contribution from CBC to pay for his defenses against the criminal charges brought by Weinstock

---

2. Weinstock died in either 2000 (Compl. ¶ 130.) or 2001 (Mery–Sanson Decl. ¶ 28.) and his estate has not, as of yet, pursued the civil litigation regarding the Prodipe shares.

and FONATUR and against civil lawsuits lodged against him relating to the Project. (Chauveau Dep. at 23.) CBC took the position that the 1996 Agreements "had settled in a definitive manner CBC's involvement in the project," however, it was Mery–Sanson's contention that section 6.02 of the 1996 Share and Loan Purchase Agreement was triggered, requiring CBC to indemnify the purchasers for any loss or claim based on the breach of any representations or warranties made by CBC in the agreement. (*Id.* at 42–43; Sills Decl. § 6.02.) CBC disagreed with Mery–Sanson's interpretation of the clause (Chauveau Dep. at 42.), but made a decision to reach a settlement with Mery–Sanson so that it could finally extract itself from the Project. (*Id.* at 40.) To that end, CBC, Mery–Sanson, MIF and all of MIF's corporate affiliates and subsidiaries entered into a settlement agreement on June 26, 2000 which stated it was the desire of the parties "to settle and release all claims relating the 1996 Agreement and the Project ...." (Sills Decl., Exh. X at 2.) In consideration for the release of all claims against CBC, CBC was to pay Mery–Sanson $2,200,000 and reschedule the debt owed by MIF and guaranteed by Mery–Sanson pursuant to the 1996 Agreements. (*Id.* at § 4; Sills Decl., Exh. B at 3.) Although payment was made to Mery–Sanson by CBC, the parties dispute the amount of the actual remittance.[3]

Based on FONATUR's criminal complaint, a warrant was issued by the Federal District of Mexico for the arrest of Mery–Sanson and others for fraud on the public funds in connection with his involvement in the Project. (Compl.¶ 139.) In 2003, the Mexican arrest warrant resulted in Mery–Sanson being detained by United States authorities when he entered the United States through Houston, Texas. (Compl.¶ 142.) He was released five days later. (*Id.*)

In 2005, FONATUR reacquired the Project's land-use rights when plaintiffs' final appeal in a Mexican foreclosure proceeding was denied. (Mery–Sanson Decl. ¶ 55.)

## II. *Discussion*

### a. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or

---

3. In plaintiffs' response to defendants' Rule 36, Fed.R.Civ.P. Requests for Admissions, they assert that they received only $1,900,000 in consideration for the 2000 Settlement.

(Sills Decl., Ex. B at 3.) No breach of contract claim is asserted for what appears to be a $300,000 shortfall.

denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (internal quotations and citations omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c), Fed.R.Civ.P. In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

#### b. Plaintiffs Rule 56(f) Opposition

Plaintiffs filed the complaint on July 25, 2006. (Doc. # 1.) At a pretrial conference held on September 22, 2006, I limited discovery to issues concerning the releases that defendants contended are enforceable barriers to the continued maintenance of this action. (Doc. 9/22/2006 Minute Entry.) I also instructed that defendants' motion for summary judgment be limited to the issue of the releases. Defendants filed their motion for summary judgment on March 16, 2007 and the motion was deemed fully submitted on May 24, 2007. (Doc. # 29.)

It is plaintiffs' contention that defendants interpreted the Court's direction to limit discovery to the issue of the releases too narrowly and prevented plaintiffs from obtaining evidence "essential to the plaintiffs' defense to the motion for summary judgment." (Newman Decl. ¶ 9.) Specifically, plaintiffs assert that they were wrongfully denied the opportunity to obtain evidence regarding the 1993 "round-trip" transaction. (*Id.*) Plaintiffs seek the remedy of either an order permitting further discovery or a denial of summary judgment solely relying upon Rule 56(f), Fed.R.Civ.P. (*Id.* ¶¶ 10–11.) For reasons that will be explained, plaintiffs' request for relief under Rule 56(f) is denied.

True, the record reveals that defendants have objected to certain of plaintiffs' discovery requests and refused to provide certain documents and to allow witnesses to answer questions during depositions on the grounds that the information being sought was beyond the scope of discovery as limited by the Court during the September 22, 2006 pretrial conference. (Newman Decl. ¶ 7–8.) In addition, on January 4, 2007, plaintiffs served interrogatories on defendants relating to the "round-trip" transaction which defendants objected to as beyond the scope of discovery and refused to answer. (*Id.* ¶ 7.)

On February 27, 2007, the parties submitted a letter to the Court, jointly requesting the adjournment of a pretrial conference and advising the Court that "[t]here are no other matters to be reported to Your Honor. All discovery relating to the motion for summary judgment has been completed; there are no outstanding discovery disputes; and there are no other proceedings scheduled other than the

briefing and the argument on the motion for summary judgment." (Sills 5/24/07 Decl., Exh. 5.) The joint request was submitted by Baker & McKenzie on Baker & McKenzie letterhead, plaintiffs' law firm, and signed by both Mr. Newman, plaintiffs' counsel, as well as Mr. Sills, defendants' counsel. (*Id.*) If and to the extent plaintiffs were of the view that defendants had improperly objected or failed to respond to discovery relating to the releases, they forfeited their right to press the issue before a ruling on the summary judgment motion by not asserting it in a timely fashion.

On April 5, 2007, the parties submitted another joint letter to the Court requesting that the summary judgment briefing schedule be amended and that a forthcoming pretrial conference be adjourned without date "[g]iven defendants' pending motion for summary judgment and the absence of any other pending matters." (Doc # 23.) Again, there was no mention of any discovery disputes. Although this letter was submitted by defendants' law firm, it was signed by both Messrs. Mr. Sills and Mr. Newman.

■ The decision to remain silent on the perceived shortcomings in defendants' pre-motion discovery responses was purely tactical. By asserting—or at least acquiescing in the assertion—that "[a]ll discovery relating to the motion for summary judgment has been completed . . . ." plaintiffs have forfeited their ability to complain at this juncture. *See e.g., Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (Rule 56(f) request for discovery will be denied when there has been a meaningful opportunity to conduct discovery); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925–28 (2d Cir. 1985) (affirming denial of Rule 56(f) motion when "undone" discovery "was the consequence of [plaintiff's] own conduct."); *Par-*

*enteau v. Kim,* No. 97 Civ. 8863(DLC), 1998 WL 740778, at *5 (S.D.N.Y. Oct.22, 1998) (denying request for discovery under Rule 56(f) when "plaintiff failed to move to compel discovery or even inform the Court that the defendants had refused to respond to his [discovery] requests [and] [t]he first notice to court of plaintiff's complaints regarding discovery came when the court received the fully submitted summary judgment motion.") *aff'd without published opinion,* 182 F.3d 900, 1999 WL 425896 (2d Cir.1999).

Alternatively, plaintiffs' Rule 56(f) application is denied because the discovery is not material to a disposition of the motion. The subject matter on which plaintiffs claim they were improperly deprived of discovery is the so-called 1993 "round-trip" transaction where CBC is alleged to have transferred money into a New York Chemical bank in the name of Consorcio to create the appearance that it was making a capital contribution to the Project before transferring the money back to its own Paris Chemical Bank account five days later. For purposes of this summary judgment motion only, defendants accept plaintiffs' version of the "round-trip" transaction. (Def. Reply Mem. at 2.)

c. Release Analysis

Defendants assert, among other things, that the 1996 Agreements released all claims asserted in this action. That the 1996 Agreements, on their face, encompass the claims in this lawsuit is not disputed. Plaintiffs have formally admitted that if the 1996 releases are valid and enforceable they "preclude[ ] plaintiffs from commencing and prosecuting this action" and that "each of Plaintiffs' claims against Defendants in [this] action is covered by the 2000 Release." (Pl. Rule 36 Admis. at 3.)

Plaintiffs make the argument that because defendants failed to disclose the al-

legedly fraudulent 1993 "round-trip" transaction to them at the time of the 1996 Agreements, plaintiffs were fraudulently induced into releasing any and all claims against defendants relating to the Project. Plaintiffs also assert that defendants had a duty to disclose the "round-trip" transaction because CBC, as "Owners Delegate" under the MOU, owed an independent fiduciary duty to plaintiffs. Further to that argument, plaintiffs assert that because CBC had control over Consorcio by virtue of the MOU, it "release[d] itself of its obligation to Consorcio" by requiring Mery–Sanson, President of Consorcio, to execute the releases that were part of the 1996 Agreements. (Pl. Mem. at 20–22.) This, plaintiffs contend, was a violation of CBC's fiduciary duties.

■ The question before the Court is whether the plaintiffs have come forward with admissible evidence from which a reasonable jury could conclude that the releases that were part of the 1996 Agreements are invalid or unenforceable. I conclude that the releases executed in connection with the 1996 Agreements bar plaintiffs claims.

■ The 1996 Agreements contain a New York choice of law provision.[4] New York law recognizes that

[A] release may not be treated lightly. It is a jural act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice.

*Mangini v. McClurg,* 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 249 N.E.2d 386 (1969).

■ New York law also recognizes that "a clear and unambiguous release . . . should be enforced according to its terms." *Booth v. 3669 Delaware,* 92 N.Y.2d 934, 935, 680 N.Y.S.2d 899, 703 N.E.2d 757 (1998). While a releasor need not be represented by counsel to validly give up his claims, the release agreement must be "knowingly and voluntarily entered into." *Skluth v. United Merch. & Mfr., Inc.,* 163 A.D.2d 104, 106, 559 N.Y.S.2d 280 (1st Dep't 1990). However, a release may be invalidated if it were "the product of fraud, duress or undue influence." *Id.* at 106, 559 N.Y.S.2d 280. Although a release may be ineffectual if it is shown to have been procured by fraud or duress, conclusory allegations of fraudulent inducement are insufficient to overcome a release's unambiguous language. *New York City School Constr. Authority v. Koren–DiResta Constr. Co.,* 249 A.D.2d 205, 205, 671 N.Y.S.2d 738 (1st Dep't 1998) (citing *Fleming v. Ponziani,* 24 N.Y.2d 105, 299 N.Y.S.2d 134, 247 N.E.2d 114 (1969)).

■ When a release is executed "in a commercial context by parties in roughly equivalent bargaining positions and with ready access to counsel, the general rule is that if 'the language of the release is clear . . . the intent of the parties [is] indicated by the language employed.'" *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.,* 558 F.2d 1113, 1115 (2d Cir.1977) (quoting *German Roman Catholic Orphan Home v. Liberty National Bank & Trust Co. (In re Schaefer),* 18 N.Y.2d 314, 317, 274 N.Y.S.2d 869, 221 N.E.2d 538 (1972)). And when general language is used in the releasing document, "the release is to be construed most strongly against the releasor . . . ." *Middle East Banking Co. v. State Street Bank Intern.,* 821 F.2d 897, 907 (2d Cir.1987) (quoting *Mr. Read Ter-*

---

**4.** The 1996 Agreements also contain a forum selection clause that names the Southern District of New York as the exclusive venue for resolution of all disputes.

*minal Inc. v. LeChase Constr. Corp.*, 58 A.D.2d 1034, 1035, 396 N.Y.S.2d 959 (4th Dep't 1977)). The burden is on the releasor to establish that the release should be limited." *Middle East Banking Co.*, 821 F.2d at 907 (citing *Mangini*, 24 N.Y.2d at 563, 301 N.Y.S.2d 508, 249 N.E.2d 386).

The Second Circuit recognizes that, under New York law, all the facts and circumstances of the claims being released need not be disclosed in order for a release to be valid and enforceable. *See Alleghany Corp. v. Kirby*, 333 F.2d 327, 333 (2d Cir.1964) (defendant's failure to disclose all aspects of an underlying fraud does not invalidate an otherwise valid settlement agreement).

In *Alleghany*, a challenge was made to the settlement and release of fraud claims as part of a state court shareholder's derivative action against directors and executives, who were accused of swapping corporate assets in a self-dealing transaction. *See* 333 F.2d at 328–29. After the state court litigation was settled a lawsuit was commenced in federal court to set aside the settlement on the ground of fraud. *See Id.* After a bench trail, the district court dismissed the complaint. In affirming the dismissal, the Second Circuit held that a claim for fraudulent nondisclosure could be settled like any other claim, and that the law did not require "that the defendant must come forward and confess to all his wrongful acts" or that "a defendant accused of fraud ... make an investigation of the files of the companies involved and ... tender voluntarily all documents that are discovered," as a precondition to being validly released from settled claims. *Id.* at 333.

Twenty years later, In *Bellefonte Re Ins. Co. v. Argonaut*, 757 F.2d 523, 527 (2d Cir.1984), the Second Circuit reaffirmed the rule set forth in *Alleghany*. In *Bellefonte*, plaintiffs brought actions to rescind

their settlement agreements and reinsurance contracts with the defendant based on claims of fraudulent inducement. 757 F.2d at 525–26. The plaintiffs argued that they could not be bound by the settlement of their fraud claims because the scope of the fraud had not been fully disclosed. *Id.* at 527. The Second Circuit rejected this argument as contrary to the rule set forth in *Alleghany*. *Id.* The *Bellefonte* plaintiffs attempted to distinguish *Alleghany*, but the Circuit concluded that the authorities upon which the plaintiff relied: "involved circumstances ... in which it was clear that no semblance of a fraud claim had come to light before the claim at issue was settled and it was clear that the parties had not intended to settle fraud claims." *Id.* at 528. The court affirmed the grant of summary judgment by the district court, noting that the fraud alleged as a basis to rescind the settlement and release of claims was the same fraud alleged to have been settled and released. *Id.* at 527.

Under *Alleghany* and *Bellefonte*, parties granting releases for fraud can only challenge the release for fraudulent inducement by pointing to "a separate and distinct fraud from that contemplated by the agreement." *DIRECTTV Group, Inc. v. Darlene Invs., LLC*, No. 05 Civ. 5819(WHP) 2006 WL 2773024, at *4 (S.D.N.Y. Sept.27, 2006); *see also Eastbrook Caribe, A.V.V. v. Fresh Del Monte Produce, Inc.*, 11 A.D.3d 296, 296, 783 N.Y.S.2d 533 (1st Dep't 2004) (affirming dismissal of fraudulent inducement of settlement agreement where fraudulent inducement was released in global settlement) *lv. denied in part and dismissed in part*, 4 N.Y.3d 844, 797 N.Y.S.2d 414, 830 N.E.2d 313 (2005); *Bongo Apparel, Inc. v. Iconix*, No. 06–601903, 2008 N.Y. Slip Op. 50000(u), 2008 WL 41341, at *9 (N.Y.Sup. Jan.2, 2008) (broad language in settlement agreement bars fraudulent inducement

claim where claim relates to or arises from settled matters regardless of when fraud is discovered).

■■■■■ Moreover, "[t]he policy underlying *Alleghany* and *Bellefonte* applies with equal force [to fiduciaries]. The purpose of a settlement is to end litigation, not to provide a breather before the next round." *Tyson v. Cayton*, 784 F.Supp. 69, 75 (S.D.N.Y.1992). A "general release executed even without knowledge of a specific fraud effectively bars a claim or defense based on that fraud." *Sotheby's, Inc. v. Dumba*, No. 90 Civ. 6458(KMW), 1992 WL 27043, at *7 (S.D.N.Y. Jan.31, 1992). If a settlement agreement encompasses claims of fraudulent inducement, a releasing party cannot attack the agreement on the grounds that the agreement was fraudulently procured. *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 306 (S.D.N.Y.1997), *aff'd without published opinion*, 166 F.3d 1201, 1998 WL 870192 (2d Cir.1998).

In *Nycal*, a purchaser and seller had settled a dispute over the purchased company. 988 F.Supp. at 298. In connection with the settlement, the parties released all claims arising out of the transaction. *Id.* Notwithstanding the settlement agreement, the purchaser sued the seller, alleging, among other things, that the seller fraudulently induced it into both the share purchase agreement and the settlement agreement. *Id.* The purchaser claimed the settlement agreement was fraudulently induced because it "was the product of fraudulent misrepresentations and omissions, specifically the failure of [seller] to inform [purchaser] that [seller] had diverted five million New Zealand dollars of the purchase price of a New Zealand company ... to accounts used for [seller's] benefit ...." *Id.* at 304–05.

In granting summary judgment in favor of the seller-defendant, Judge Kaplan concluded that the parties intended the settlement agreement to be a general release which encompassed all claims relating to the SPA, including those of fraudulent inducement. *Id.* at 302. In holding that *Alleghany* was applicable, the court stated:

A party that settles a claim of fraudulent inducement cannot revisit that settlement by asserting that the alleged defrauding party did not make a full disclosure of its own fraud. This is so even if the defrauding party has an independent duty to disclose, and even when the release was executed without knowledge of certain specific frauds.

*Id.* at 306 (citing *Tyson*, 784 F.Supp. at 74–75; *Sotheby's*, 1992 WL 27043, at *7). The court further noted that *Alleghany* and *Tyson* make clear that "in the context of fiduciary duties and their attendant duties to disclose, the *Alleghany–Bellefonte* rule does not contain any exception for a party to whom a full disclosure is owed." *Nycal*, 988 F.Supp. at 307 n. 80 (citing *Alleghany* at 333; *Tyson*, 784 F.Supp. at 74–75).

Plaintiffs' assert that *Alleghany* and *Bellefonte* are not applicable because their holdings only apply to the "settlement of a fraud case" and no release at issue here was born from the settlement of a fraud claim. *Alleghany*, 333 F.2d at 333. Plaintiffs also point to *Bellefonte*'s distinction of cases where "no semblance of fraud had come to light before [the settlement or release]" and contend that is exactly the case here. *Bellefonte*, 757 F.2d at 528. Plaintiffs' reading of *Alleghany* and *Bellefonte* is too narrow given the unambiguous release language. The parties expressed an intent to release "any and all actions, causes of actions, suits ... claims and demands whatsoever ... whether known or unknown, contemplated or not contemplated, foreseen or unforeseen, ... that the RELEASOR ever had now has or hereafter can, shall or may have ... relating to or touching upon (the Project) ..."

(Sills Decl. Exh. G at 2–3, Exh. H at 1–2.) Such language of "remarkable breadth" makes clear the parties' intent to release all claims, including those of fraudulent inducement. *Bellefonte,* 757 F.2d at 527. Even if "no semblance of fraud had come to light" before the releases were executed, "it [is] clear that the parties ... intended to settle fraud claims." *Id.* at 528. Plaintiffs have, in effect, settled all their "fraud case[s]" against defendants relating to the Project, including those that have yet to be commenced.

The broad releasing language encompasses a fraudulent inducement claim because the claim relates to the Project. *Alleghany* and *Bellefonte* therefore apply and CBC's nondisclosure of frauds relating the Project does not invalidate the releases. In addition, and as plaintiffs concede, the releases executed as part of the 1996 Agreements cover the two RICO claims alleged in plaintiffs' complaint. Those allegations are rooted in the 1993 "round-trip" transaction and allege a cover-up that continued until CBC divested itself of interest in the Project. The record reveals that there have been no actionable events since plaintiffs released all claims relating to the Project in 1996. Indeed, Mery–Sanson's 2003 arrest and the alleged fraudulently inducement of Mery–Sanson and MIF to enter into the 2000 agreement are consequences of the alleged nondisclosure of an alleged pre–1996 fraud.

Plaintiffs' allegation that CBC, in violation of fiduciary duties, used its control of Consorcio to force it, through its president, Mery–Sanson, to release CBC from claims relating to the Project, is unsupported by the record and, thus, does not create an issue of fact requiring trial.[5] First, I note that plaintiffs have not cited any authority in support of the conclusory assertion that CBC and Consorcio were in a fiduciary relationship. Second, although plaintiffs assert that CBC "engaged in the blatantly improper action of purporting to release itself of its obligations to Consorcio by using its control over Consorcio to cause Consorcio to execute this release ....," nothing in the record before me indicates there was any opposition or unwillingness on Mery–Sanson's, Consorcio's or anyone's part to enter into the release agreements at issue or the 1996 Agreements in general. Mery–Sanson's declaration states: "Since I continued to be the President of Consorcio, I signed on its behalf at the Closing, but only because I was permitted to do so by CBC." (Mery–Sanson Decl. ¶ 43.) This vague and conclusory assertion is insufficient to create a genuine issue for trial. If CBC "caused" or "permitted" Mery–Sanson, Consorcio's president, to sign a release, it was because the negotiated Share and Loan Purchase Agreement, through which Mery–Sanson's company, MIF, purchased the Project, required such a release to be delivered at the closing. (Sills Decl., Exh. F § 3.03.) The releases at issue were part of a transaction among parties who were sophisticated and represented by counsel. The record is devoid of any indications of CBC using pressure or its control to cause Mery–Sanson to execute any agreements.

Finally, plaintiffs had asserted in this litigation that the 1996 releases were un-

---

**5.** Plaintiffs point to paragraphs 37 and 47 of Mery–Sanson's declaration submitted in opposition to the motion. (Pl. Mem. at 20–21.) Paragraph 47 relates solely to the 2000 agreement and paragraph 37 states in full: "In connection with the 1996 Agreements there were also releases, certain of which were singed by me on my own behalf and one by Mr. Weisberg on my instructions, on behalf of MIF. Consorcio also executed releases. The beneficiaries of these releases were, among other persons, CBC." (Mery–Sanson Decl. 37.)

conscionable because plaintiffs were not "represented by legal counsel in connection with the negotiating and signing of the 1996 Releases." (Sills Decl., Exh. C. at 12.) Plaintiffs now admit in their 56.1 Responses that: 1) "Mery–Sanson reviewed drafts of the Purchase Agreement prior to the closing and discussed the Purchase Agreement with his counsel"; and 2) "Antonio Nunez Prado, a Mexican lawyer, advised Mery–Sanson in connection with the 1996 Agreements." (Pl. 56.1 Resp. 31–32.) Moreover, plaintiffs admit that "[a]cting as 'special New York counsel to MIF,' [the law firm] Parker Chapin delivered an opinion setting out its belief that the 'Agreement and each of the Ancillary Documents,' which includes the 1996 Releases, 'constitute the legal, valid and binding obligations of each of the Purchasers, enforceable against each of the Purchasers in accordance with their respective terms.'" (Pl. 56.1 Resp. 34.)

No reasonable jury could, on this record, conclude that the releases given as part of the 1996 Agreements were anything other than the valid and enforceable releases of CBC by both Consorcio and Mery–Sanson. Thus, they preclude plaintiffs from bringing any claims against defendants CBC, Bentegeat and Zacharias that relate to or touch upon the Project.

#### d. Vinci

Although the parties to this lawsuit make no distinction among defendants in arguing whether or not plaintiffs' claims were validly released, there is a separate question of whether Vinci, CBC's parent, is entitled to summary judgment. Vinci did not become CBC's parent until 1997 when it purchased approximately 90 percent of its shares and therefore was not a party to the 1996 Agreements or the preceding events. I conclude that summary judgment in favor of Vinci is appropriate be-

cause all claims asserted in this action have their genesis in facts existing prior to 1996—events in which Vinci was not a participant. Plaintiffs have failed to come forward with evidence upon which a reasonable jury could conclude that Vinci engaged in any activity subjecting it to liability.

#### Conclusion

For all the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk is directed to enter judgment in favor of defendants.

SO ORDERED.