OPINION OF THE COURT
Barbara R. Kapnick, J.
In this motion, defendants move for an order, pursuant to *386 CPLR 3212, granting them summary judgment dismissing the amended verified complaint based on defendants’ second affirmative defense.
Background
The facts recited herein are taken from defendants’ Rule 19-a statement of material facts (see Rules of Commercial Div of Sup Ct [22 NYCRR] § 202.70 [g]), unless otherwise noted.
Defendants Ziel Feldman and Kevin Maloney are real estate developers operating under the name of Property Markets Group, Inc.
Plaintiffs are all controlled, affiliated or associated with nonparty Marc E. Berson, who is a non-practicing attorney and the co-founder and chairman of the Fidelco Group, a financial consulting firm that provides clients with valuation services in various contexts, including the sale of a business. Berson and Fidelco have also been involved in various real estate developments in New Jersey and New York.
In or about 1997, Feldman and Maloney acquired a number of single room occupancy hotels in New York City, which they renovated and converted into modern transient hotels.
That same year, Feldman and Maloney organized defendant 2170-2178 Broadway, LLC (Broadway LLC) to acquire the Broadway-American Hotel, now known as “Hotel On the Ave,” located at 2170-2178 Broadway, New York, New York (Hotel OTA). Berson was an individual member of defendant Broadway LLC. The other members of Berson’s group were three trusts for Berson’s children and the remaining individual plaintiffs. Since 1998, Berson owned 21.63% of Broadway LLC and his group collectively owned 32.66% of Broadway LLC. Berson assigned his interests to plaintiff Kafa Investments, LLC and the three trusts assigned their interests to plaintiff Fidelco Family, LLC. Berson is the managing member of Kafa and the agent for Fidelco Family.
In 2004, defendant Broadway LLC, as part of a refinancing, transferred title of Hotel OTA to 2170-2178 Broadway Owner LLC (Broadway Owner), which was a wholly owned subsidiary of defendant Broadway LLC and is treated as one and the same with Broadway LLC.
After acquiring Hotel OTA, Maloney and Feldman organized Fifty Seventh Street Operating LLC (57 LLC) to acquire a net lease to the Allerton Hotel, now known as Hotel 57, located at 130 East 57th Street, New York, New York (Hotel 57). Feldman *387 and Maloney were members of 57 LLC and the principals of the corporate managing member. Members of 57 LLC also included a group of investors controlled by Berson under the name 57th Street Fidelco LLC (57th Fidelco).
In 1998, Feldman and Maloney organized Thirty East 30th Street LLC (30 LLC) to acquire the Martha Washington Hotel, now known as Hotel Thirty Thirty, located at 30 East 30th Street, New York, New York (Hotel 30-30). Berson and/or his group had no interest in Hotel 30-30.
In 2006, Feldman and Maloney decided to sell the hotels and retained Cushman & Wakefield to market the three hotels, both separately, or together as one package. On June 7, 2006, Feldman sent Berson the summary of the bids he received from Cushman & Wakefield.
According to plaintiffs, in or about late summer of 2006, defendants, by and through Feldman and Maloney, approached plaintiffs about redeeming their interests in Broadway Owner. (Amended verified complaint ¶ 19.) Plaintiffs allege that defendants, by and through Feldman and Maloney, represented to plaintiffs that Broadway Owner was valued at approximately $125 million. (Id. ¶ 20.) Based on this representation, plaintiffs allege that they agreed to accept $5.2 million in exchange for their interests in Broadway Owner. (Id. ¶ 21.)
By letter dated May 10, 2006, a Boston investment group, Rockpoint Group, made a bid to acquire the three hotels as one package for a total of $300 million. The transaction was structured as a recapitalization with Rockpoint acquiring a controlling interest in a new entity that would own the three hotels and the sellers acquiring the remaining interest in the new ownership entity. Feldman and Maloney accepted Rockpoint’s bid, which allocated $125 million for Hotel OTA, $70 million for Hotel 57 and $105 million for Hotel 30-30.
During the summer of 2006, defendants’ attorneys negotiated a contract with Rockpoint’s attorneys. On August 23, 2006, Broadway Owner, 57 LLC and 30 LLC entered into an agreement with Rockpoint’s designated entity RP Manhattan Hotels LLC entitled the “Acquisition and Contribution Agreement” (the Rockpoint contract), which provided for the same terms as contained in Rockpoint’s bid and set closing for September 30, 2006.
After the Rockpoint contract was signed, defendants learned that they could not convey the Hotel OTA interests until March *388 2007 because of the terms of the existing mortgage on the property. The parties agreed to proceed with the closing for Hotel 57 and Hotel 30-30 and to adjourn the closing for Hotel OTA. On November 28, 2006, Hotel 57 and Hotel 30-30 closed for $70 million and $105 million, respectively.
Through counsel for Berson and counsel for Feldman and Maloney, the parties negotiated the redemption of plaintiffs’ interests in Hotel OTA (the Hotel OTA redemption agreement). Revisions were exchanged between counsel until the closing on Hotel OTA, which occurred on March 14, 2007. The sale price of Hotel OTA was $125 million, $5.2 million of which went to plaintiffs.
Plaintiffs filed their complaint on December 16, 2009, which generally alleges that at the time of the Hotel OTA redemption agreement, defendants knew and failed to disclose that Hotel OTA was worth more than $125 million and that defendants had “already entered into negotiations to sell [Hotel OTA] to a third party for significantly more than the $125 million value that Defendants represented to plaintiffs.” According to the complaint, in or about August 2007, a mere five months after defendants redeemed plaintiffs’ interest in Broadway Owner, Hotel OTA was sold to a third party for a reported $201 million, $76 million more than the $125 million value that defendants represented to plaintiffs. (Amended verified complaint ¶ 24.)
The complaint contains the following causes of action: (1) breach of fiduciary duty; (2) breach of the duty of good faith and loyalty; (3) fraudulent inducement; (4) intentional misrepresentation; and (5) unjust enrichment.
Discussion
Defendants now move for an order pursuant to CPLR 3212 granting defendants summary judgment dismissing the complaint based on defendants’ second affirmative defense. The second affirmative defense, which is pleaded in paragraph 21 of the amended answer to the amended complaint, alleges that “[p]ursuant to the Assignment and Redemption Agreement relied upon by Plaintiffs, Plaintiffs released any claim they may have had against Defendants.”
The instant motion focuses on the release contained in section 5 of the Hotel OTA redemption agreement (the section 5 release), which provides as follows:
“5. Release.
“(a) Each Withdrawing Member, on behalf of *389 himself and his heirs and legal representatives or successors and assigns (collectively, the “WM Releasing Parties”), hereby fully and forever releases, acquits, and discharges the Company and all other members of the Company (collectively, the “Company Released Parties”), from any and all rights, claims, demands, judgments, suits, actions and causes of actions whatsoever, whether in law or in equity, whether known or unknown, whether contingent or non-contingent or whether past, present or future which the WM Releasing Parties, or any of the [sic] them, may now or hereafter have or assert anywhere in the world against the Company Released Parties, or any of them, for, on account of, or related to, any and all rights, property, assets, liability, damage, loss, injury cost, expense, matter, cause or things of whatever kind from the beginning of the world to the Closing Date.
“(b) The Company, on behalf of itself and its members (other than Withdrawing Members) and managers and their respective successors and assigns (collectively, the “Company Releasing Parties”), hereby fully and forever releases, acquits, and discharges the Withdrawing Members and their respective members, successors and assigns or heirs and legal representatives (collectively, the “WM Released Parties”), from any and all rights, claims, demands, judgments, suits, actions and causes of actions whatsoever, whether in law or in equity, whether known or unknown, whether contingent or non-contingent or whether past, present or future which the Company Releasing Parties, or any of the [sic] them, may now or hereafter have or assert anywhere in the world against the WM Released Parties, or any of them, for, on account of, or related to, any and all rights, property, assets, liability, damage, loss, injury cost, expense, matter, cause or things of whatever kind from the beginning of the world to the Closing Date.
“(c) Notwithstanding the foregoing provisions of this Section 5, in no event shall the releases granted above apply to or release (i) any of the respective obligations of the parties to be performed under this Agreement or (ii) any of the obligations of the parties under that certain Assignment and Redemption Agreement dated November 22, 2006 between 57th *390 Street Fidelco and 57th Street Operating LLC or the other documents executed and delivered in connection therewith, including without limitation, that certain Indemnity Agreement dated November 22, 2006 by Kevin Maloney and Ziel Feldman in favor of 57th Street Fidelco LLC.”
Defendants argue that the Court of Appeals’ decision in Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V. (17 NY3d 269 [2011]) is dispositive and makes clear that the operative language of the above quoted release disposes of all of plaintiffs’ claims.
In Centro Empresarial, the former owners of a minority interest in a company sued the majority owners who also managed the company. Defendants made a motion to dismiss the complaint on the grounds, inter alia, that the action was barred by a release that the plaintiffs had given in connection with a buyout of their interests. The IAS Court, Justice Richard B. Lowe III, denied the motion to dismiss. The Appellate Division, First Department, reversed, holding that the claims were barred by the general release. (Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V, 76 AD3d 310 [1st Dept 2010].) That decision was affirmed by the Court of Appeals (17 NY3d 269).
The Court of Appeals determined as a preliminary matter that the release at issue there “encompasse[d] unknown fraud claims.” Specifically the Court found that
“ft]he broad language of the release reaches ‘all manner of actions . . .whatsoever. . . whether past, present or future, actual or contingent, arising under or in connection with the Agreement Among Members and/or arising out of.. . the ownership of membership interests in [TWE]. ’ The phrase ‘all manner of actions,’ in conjunction with the reference to ‘future’ and ‘contingent’ actions, indicates an intent to release defendants from fraud claims . . . unknown at the time of contract.” (Centro Empresarial, 17 NY3d at 277 [emphasis added and citations omitted].)
Despite the similarity between the facts and the operative language in the section 5 release and the release at issue in Centro Empresarial, plaintiffs insist that their unknown fraud claims are not covered by the release.
Plaintiffs attempt to distinguish this case from Centro Empresarial on the grounds that in Centro Empresarial, the plaintiff *391 knew it was releasing fraud claims and was actually settling those potential claims by signing the release. Plaintiffs also draw attention to the fact that the relationship between the parties in Centro Empresarial was hostile at the time of the signing of the release and that the parties no longer had a relationship of trust. Here, the plaintiffs allege that they were totally unaware of any potential fraud claims when they signed the Hotel OTA redemption agreement, which includes the release language, and that their relationship of trust with the defendants was fully intact during contract negotiations.
These distinctions, however, do not make Centro Empresarial's holding inapplicable to this case. The Court of Appeals in Centro Empresarial interpreted the unambiguous terms of the release there, and held that the language of the provision itself operated to release unknown fraud claims. In making this finding, the Court cited Consorcio Prodipe, S.A. de C.V. v Vinci, S.A. (544 F Supp 2d 178, 191-192 [SD NY 2008]), which held that
‘‘[t]he parties expressed an intent to release ‘any and all actions, causes of actions, suits . . . claims and demands whatsoever . . . whether known or unknown, contemplated or not contemplated, foreseen or unforeseen, . . . that the RELEASOR ever had[,] now has or hereafter can, shall or may have ... relating to or touching upon (the Project) . . . .’ Such language of ‘remarkable breadth’ makes clear the parties’ intent to release all claims, including those of fraudulent inducement. Even if ‘no semblance of fraud had come to light’ before the releases were executed, ‘it [is] clear that the parties . . . intended to settle fraud claims.’ ” (Citations omitted and emphasis added.)
The release language in the OTA redemption agreement in this case also includes the phrase “whether known or unknown.” The court must interpret the language of the release according to its terms (Booth v 3669 Delaware, 92 NY2d 934, 935 [1998]; Serbin v Rodman Principal Invs., LLC, 87 AD3d 870 [2011]), and “not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect.” (Acme Supply Co., Ltd. v City of New York, 39 AD3d 331, 332 [1st Dept 2007] [internal quotation marks and citation omitted].)
Generally, “a valid release constitutes a complete bar to an action on a claim which is the subject of the release.” (Global Mins. & Metals Corp. v Holme, 35 AD3d 93, 98 [1st Dept 2006], *392 lv denied 8 NY3d 804 [2007].) A release may be invalidated, however, for any of “the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake.” (Mangini v McClurg, 24 NY2d 556, 563 [1969].)
“Although a defendant has the initial burden of establishing that it has been released from any claims, a signed release ‘shifts the burden of going forward ... to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release.’ ” (Centro Empresarial, 17 NY3d at 276, citing Fleming v Ponziani, 24 NY2d 105, 111 [1969].)
Of course, “a party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release. Were this not the case, no party could ever settle a fraud claim with any finality.” (Centro Empresarial, 17 NY3d at 276 [citation omitted].)
Plaintiffs here allege that “[d]uring negotiations, Defendants, by and through Feldman and Maloney, represented to Plaintiffs that 2170-2178 Broadway was valued at approximately $125 million” (amended verified complaint ¶ 21), and that based on this representation, plaintiffs agreed to accept $5.2 million in exchange for their interests in the property (id. ¶ 22). Plaintiffs also allege that “[u]pon information and belief, Defendants knew at the time that the parties entered into the Redemption Agreement and failed to disclose to Plaintiffs that ‘On the Ave’ was actually worth significantly more than the $125 million value that Defendants represented to Plaintiffs” (id. ¶ 25), and that “[u]pon information and belief, Defendants misrepresented the value of ‘On the Ave’ ... to induce Plaintiffs to enter into the Redemption Agreement and surrender their interests in 2170-2178 Broadway for less than the true value of those interests” (id. ¶ 27).
As the Court held in Centro Empresarial:
“Having executed this release, plaintiffs cannot now claim that defendants fraudulently misled them regarding the value of their ownership interests in TWE unless the release was itself induced by a separate fraud. The fraud described in the complaint, however, falls squarely within the scope of the release: plaintiffs allege that defendants supplied them with false financial information regarding the value of Conecel and TWE, and that, based on this false information, plaintiffs sold their interests in *393 TWE and released defendants from claims in connection with that sale. Thus, as the Appellate Division observed: ‘plaintiffs seek to convert the 2003 release into a starting point for new . . . litigation, essentially asking to be relieved of the release on the ground that they did not realize the true value of the claims they were giving up.’ ” (Id. at 277-278 [emphasis added and citation omitted].)
Here, as in Centro Empresarial, the fraud described in the complaint falls squarely within the scope of the release and there are no allegations that a separate fraud was perpetrated to induce the signing of the release.
Nor does the fact that the parties were in a fiduciary relationship change this court’s interpretation of the meaning of the release. (See Consorcio, 544 F Supp 2d at 191.) As the Court of Appeals stated in Centro Empresarial: “[p]laintiffs here are large corporations engaged in complex transactions in which they were advised by counsel. As sophisticated entities, they negotiated and executed an extraordinarily broad release with their eyes wide open. They cannot now invalidate that release by claiming ignorance of the depth of their fiduciary’s misconduct.” (Centro Empresarial, 17 NY3d at 278.) Moreover, the Court noted that “[w]here a principal and fiduciary are sophisticated parties engaged in negotiations to terminate their relationship, . . . the principal cannot blindly trust the fiduciary’s assertions.” (Id. at 279.)
Here, the defendants do not dispute (for purposes of this motion) that the parties were in a fiduciary relationship. (Defendants’ mem in support at 6.) They argue, however, that the existence of the fiduciary relationship does not alter the outcome. Plaintiffs, on the other hand, contend that they “trusted and had no reason not to trust Defendants when they signed the Redemption Agreement, which included what they believed to be a pro forma release.” (Plaintiffs’ mem in opposition at 18.) The court finds, in light of the case law, that the unambiguous language of the release cannot be abrogated by the fact that the parties were fiduciaries, especially here, where the Hotel OTA redemption agreement was in effect an agreement to end the parties’ relationship with respect to their interests in the Hotel OTA. Plaintiffs, who are sophisticated parties and who were represented by sophisticated counsel, cannot now invalidate the release they signed by claiming ignorance of its meaning.
The court has considered plaintiffs’ argument that this court should follow the Appellate Division, First Department’s hold *394 ing in Blue Chip Emerald v Allied Partners (299 AD2d 278 [1st Dept 2002]) here. However, as observed by the Appellate Division, First Department, in Centro Empresarial:
“It was critical to the result in Blue Chip that the plaintiff in that case did not have ‘at its disposal ready and efficient means’ for ascertaining whether such an oral agreement (or an offer in the relevant price range) even existed. Here, by contrast, plaintiffs were well aware that Conecel did have a value, and nonetheless chose to cash out their interests without either insisting on verifying defendants’ representations as to that value or, on the other hand, conditioning the deal on the accuracy of the information they did receive. . . . Blue Chip is further distinguishable on the ground that it did not involve a formal general release but only contractual disclaimers of reliance.” (Centro Empresarial Cempresa S.A., 76 AD3d at 321.)
This court finds that Blue Chip is distinguishable here for the same reasons. Not only is there a formal general release in the instant case, there is also no indication from the plaintiffs that they took any steps or made any efforts to verify or otherwise reasonably rely on the valuation figure presented by the defendants.* As stated before, Berson is a sophisticated party, who was represented by sophisticated counsel and there are no allegations to support the notion that plaintiffs were without the means to investigate the accuracy of the valuation.
Accordingly, based on the papers submitted and the oral argument held on the record on November 30, 2011, defendants’ motion for summary judgment based on the second affirmative defense is granted and the amended verified complaint is dismissed with prejudice and without costs or disbursements.

 Plaintiffs also relied extensively during oral argument on the Appellate Division, First Department, decision in Pappas v Tzolis (87 AD3d 889 [2011]). However, that decision was recently reversed by the Court of Appeals (20 NY3d 228 [Nov. 27, 2012]).